Mrs. Neva Bostick

*v.*

State of Tennessee.

360 S.W.2d 472

(*Jackson,* April Term, 1962.)

Opinion filed September 21, 1962.

Will Tom Abernathy, Selmer, Ross & Ross, Savannah, for plaintiff in error.

George F. McCanless, Attorney General, Lyle Reid, Assistant Attorney General, Nashville, for the State.

Mr. Justice Felts delivered the opinion of the Court.

Plaintiff in error, Mrs. Neva Bostick, shot and killed her husband, Owens Bostick, with a pistol. For this, she was indicted for murder, tried, and found guilty of involuntary manslaughter, and sentenced to serve one year in the penitentiary.

She appealed in error and has assigned errors insisting that the evidence preponderates against the verdict of guilt and in favor of her innocence; and that the Trial Court erred in refusing four special requests by her for additional instructions to the jury upon her theory that

the killing was in self-defense, unintentional, and accidental.

On the trial, there was adduced a large amount of evidence as to the past lives of these parties and as to the circumstances leading up to this homicide. It appears that the Bosticks lived in Selmer and operated a furniture store there. She was 43, and he seems to have been much older. They were married in 1956, this being her fourth and his third marriage. By her prior marriages, she had three daughters, one married and living in Memphis, and two, aged respectively ten and seven, living at the Bostick home in Selmer, and these two children had been adopted by him.

It appears that both the husband and wife were addicted to drinking alcoholic liquors, and this often caused trouble between them, or at least when drunk, they frequently had disagreements and quarrels. They had both been on a continuous drunk for two days at the time of the shooting; and she had no clear recollection of the details of the occurrence.

She had just come back from a trip to Memphis, and an old friend of hers, a Mrs. Fields, had come with her for a visit to her home in Selmer. They arrived in Selmer Tuesday evening September 13, 1960. On the next day (Wednesday) the stores in Selmer were not open; and the Bosticks and Mrs. Fields went in an automobile to Shiloh and Pickwick Dam, where they drove around, bought some whiskey, and each of them had a number of drinks. They came back to Selmer that evening, visited some friends there, had more drinks and two of the friends, and another man, referred to in the record as a

"strange" man, came to the Bostick home where the drinking was continued until after midnight.

By that time they were all pretty drunk, and Bostick was so drunk that he had "passed out." Then Mrs. Bostick and Mrs. Fields and the man, above referred to, decided to go to a nightclub and do some dancing; and he accordingly took them in his pickup truck to Club 45, located on the highway just below the Mississippi-Tennessee boundary line. There, they had more drinks and danced with a number of men until the "wee small hours" of the morning.

Meanwhile, this man disappeared, and Mrs. Bostick and Mrs. Fields became separated. Mrs. Fields started walking back alone to Selmer, but hitchhiked a ride with a truck driver who put her out somewhere in Selmer, and she called Bostick on the telephone to come and get her. He came in his car and they went somewhere out the highway, where he got some more whiskey, and they returned to the Bostick house and drank some more.

Mrs. Bostick had not come home. She testified that after she and Mrs. Fields had lost track of each other, she became so drunk she fell out, and waked up about 8 A.M. Thursday morning near Corinth, Mississippi, in a parked car with some man whom she did not know. He brought her back to Selmer and allowed her to get out some distance from her home, she not wishing her husband to see her with that man; and she walked the rest of the way home.

As she entered, Bostick met her at the front door. He was drunk, in a great rage, and began cursing and calling her vile names, and threatening to kill her with a pistol

he had. He also threatened Mrs. Fields and made both of the women sit on the couch in the living room where he was sitting, and held the pistol on them for the greater part of the morning. Then he told Mrs. Bostick that he was going to behave himself, and handed her the pistol. She took it, said "I am going to be fair," and put it under the cushion of the couch.

About that time a customer came to the Bostick home, said a refrigerator he had bought at the store didn't work, and he wanted to exchange it for another one. Bostick was still too drunk to talk to the customer; and Mrs. Bostick and Mrs. Fields went to the store and exchanged the refrigerator. After they had finished with the customer, they found a full half-pint of whiskey in a desk drawer at the store, drank all of it, and then went back to the Bostick home.

When they got back to the house, Bostick reached under the cushion, got the pistol Mrs. Bostick had put there, and began cursing and threatening her and Mrs. Fields. It was then in the late afternoon, and one of the little girls telephoned that she had been let out of school and was ready to come home, and asked that they come for her in the car. Bostick went and picked her up, and then drove to a place where he got some more whiskey, and returned home with the child in a short time. He was still drunk and had the pistol in his outside coat pocket.

The pistol was a .25 caliber automatic. There was another pistol, the one with which he was slain, a .22 H & R revolver, which Mrs. Bostick had had hidden in the bathroom for three or four weeks. All the chambers of its cylinder were loaded, and it, with part of a box of car-

tridges, was in a pasteboard box, which she had put in the linen closet back behind a board that had been removed near the bathtub.

After he came back with the little girl, with two more bottles of whiskey, which he set on the kitchen cabinet, he sat down on the couch in the living room. He began cursing and threatening Mrs. Bostick, but did not take the automatic pistol out of his pocket. She then decided to disarm him; and she put her knees on his lap, held his arms, and Mrs. Fields got the pistol out of his pocket, and took it with her into the kitchen.

It was shortly after they disarmed him that Mrs. Bostick shot him. There was no eyewitness to the shooting, or the circumstances immediately preceding it, except Mrs. Bostick herself; and, as stated, she had no clear recollection of the details of the occurrence.

The shooting occurred about 5:30 or 6 P.M. Thursday (Sept. 15). The deceased was sitting on the couch in the living room. The little girls, Mrs. Bostick and Mrs. Fields were in the kitchen, the two latter preparing the evening meal (neither of the women nor deceased had eaten any breakfast or lunch). According to Mrs. Bostick's testimony, she saw the two half-pint bottles of whiskey he had put on the kitchen cabinet, and she went to remonstrate with him about this.

She said he was sitting on the couch and she walked back "in the hallway there," and asked him why he had brought in more whiskey; that he said " 'God damn it don't you start on that whiskey or I will kill you,' and began to reach under this couch and I said well I have got one too"; and that she "whirled into that linen closet

and got it." Telling what followed, on direct examination, she said:

"Q. And after you got it out [the pistol out of the box], what did you do?

"A. I went back in the hallway is *about all I remember*.

"Q. At that time was Mr. Bostick still reaching under the cushion?

"A. Yes sir he was still fumbling under the couch cushion on this side and that one too.

"Q. And what was he saying at that time?

"A. He said God damn you I am going to kill you.

"Q. And what did you do then?

"A. *I guess I fired the pistol.*

"Q. Did you swing it around toward him?

"A. Yes sir, I was just standing there in the little doorway that went into the hall" (italics ours).

Under further questions by her counsel, she said that she did not know where the pistol was which they had shortly before taken from him; and that both he and she thought it "might be or could be under that couch." She further said she had no intention of killing deceased, and was only trying to "put him in fear enough that he wouldn't pull the pistol." She also said:

"Q. Did you feel like at the time that you were in danger of bodily harm yourself at the time you got the pistol?

"A. Yes sir, Mr. Ross, I sure did.

"Q. And did you, when the pistol fired, where was Mr. Bostick at that time?

"A. He was sitting on the couch, on this end.

"Q. When you say on this end, which end, the south end?

"A. The south end, yes sir.

"Q. And did you aim the pistol at him?

"A. *I don't remember just how it did happen*" (italics ours).

On direct examination she also said that she did not know what occurred after she fired the shot, because she "just went all to pieces." But she put the pistol back into the box and again hid it in the linen closet behind the board near the bathtub, where she had hidden it before. On cross-examination, she admitted that she knew that she and Mrs. Fields had disarmed deceased, taken the pistol from him, shortly before she walked into the hallway to ask him why he had brought in more whiskey. As to what happened just before the shooting, she said:

"Q. While you were standing there was that gun in your hand, and in the hallway, where was Mr. Bostick?

"A. He was on the couch.

"Q. And was it from where you were standing that you then shot him?

"A. I guess, to tell you the truth *I really don't know what happened.*

"Q. Mrs. Bostick you remember most of these other things, why can't you remember that?

"A. Well, like I said, I just went all to pieces, I was excited and tore up, and *I just don't know.*

"Q. And drunk?

"A. Yes, drinking, yes" (italics ours).

As soon as she shot deceased, Dr. Peeler was called, and the sheriff and a state trooper also came. Mrs. Bostick had fired one shot from the pistol which entered the left front of deceased's abdomen and ranged toward the right side. The doctor and his nurse immediately took Bostick to the Hardin County Hospital in Savannah, where he died some days later as a result of this gunshot wound.

The doctor and the officers said that Mrs. Bostick and Mrs. Fields were drunk. But the officers hesitated to arrest them at that time, since there was no one to leave with the little girls. After counselling with the District Attorney General, they decided to defer the arrest until next day. Mrs. Fields and Mrs. Bostick then went in a taxicab to the hospital, and were so boisterous there that they were arrested, stayed in jail all night, and the next morning paid a fine on a plea of guilty of public drunkenness.

The learned Trial Judge submitted the case to the jury upon a charge, with which no fault is found, fully instructing the jury in all the degrees of homicide from murder in the first degree to involuntary manslaughter; and he also charged defendant's theory of self-defense in language which has been many times approved in our cases and with which defendant, likewise, finds no fault.

Some of such cases are *Sherman v. State,* 125 Tenn. 19, 46, 140 S.W. 209; *Frazier v. State,* 117 Tenn. 430, 442-445, 100 S.W. 94, and like cases.

■ So, we think there is no merit in the first three assignments of error which are upon the facts, and through which plaintiff in error insists that the evidence preponderates against the verdict of guilt and in favor of her innocence. Under a fair and proper charge, and with ample evidence to support their verdict, the jury found defendant guilty of involuntary manslaughter and gave her the minimum punishment (T.C.A. sec. 39-2411). Indeed, upon the evidence, they might well have found her guilty of murder in the second degree.

The admitted fact of her killing deceased with a deadly weapon raised a presumption of malice and justified a finding of murder in the second degree, in the absence of facts or circumstances rebutting the presumption. *Foster v. State,* 74 Tenn. 213, 214, 216; *Lewis v. State,* 202 Tenn. 328, 332-333, 304 S.W.2d 332; *Neely v. State,* 210 Tenn. 52, 356 S.W.2d 401.

■ We think the jury might well have found that there were no such rebutting facts or circumstances. While the defense of justifiable killing in self-defense was sought to be set up for her, her own testimony failed to support such defense—failed to show that, at the moment of the killing, she acted upon an honest belief, based on reasonable ground, that it was necessary to kill deceased in order to save her own life (*Sherman v. State,* supra). On the contrary, she admitted: "I didn't remember just what happened—I really don't know what happened."

■■ It is true the killing occurred after the parties had been upon a continuous and prolonged drunk; but it is well settled that voluntary drunkenness is no mitigation of crime, except where a specific intent, or deliberation and premeditation is an essential ingredient of the offense; and such drunkenness is no excuse or defense to a finding of murder in the second degree or lesser included offenses. *Walden v. State*, 178 Tenn. 71, 156 S.W.2d 385; *Lewis v. State*, 202 Tenn. 328, 336-337, 304 S.W.2d 322; *Harper v. State*, 206 Tenn. 509, 516-517, 334 S.W.2d 933.

■ Plaintiff in error's fourth assignment is that the Trial Judge erred in refusing her special request to charge the jury that the burden of proof was on the State to prove, beyond a reasonable doubt, all the elements of one of the homicides charged, including the fact that she did not act in self-defense. We think there was no error in the refusal to charge this special request, because the matter had been fully and adequately covered in the Judge's general charge.

■ Plaintiff in error's fifth assignment of error complains of the Trial Judge's refusal to charge her special request for additional instructions to the jury to the effect that ''if she had reasonable grounds to believe that the deceased would find or procure a gun, and if it appeared to her that she was in danger of death or great bodily harm at the hands of deceased, then she would be justified in shooting to protect herself, even though it might later appear that the deceased had no gun, or there was no gun in the place where he was looking.''

We think there was no error in the refusal of this request because the matter had been fully covered in the

Judge's general charge to the jury, by instructions which were correct and with which plaintiff in error has found no fault.

■ The sixth and seventh assignments respectively complain of the Trial Judge's refusal of two special requests by plaintiff in error for additional instructions to the jury, to the effect that if she intended no harm, and the killing was by accident or by non-culpable negligence, then the jury should acquit her. We think there was no error in refusing this request, because there was no factual basis for such instruction.

All of the assignments of error are overruled and the judgment of the Circuit Court is affirmed. The costs are adjudged against plaintiff in error.