John C. PYBURN, Plaintiff-in-Error,

v.

STATE of Tennessee, Defendant-in-Error.

Court of Criminal Appeals of Tennessee.

April 6, 1976.

Certiorari Denied by Supreme Court
July 26, 1976.

Robert S. Peters, Winchester, for plaintiff in error.

R. A. Ashley, Jr., Atty. Gen., R. Jackson Rose, Asst. Atty. Gen., Nashville, J. William Pope, Jr., Dist. Atty. Gen., Pikeville, Robert J. Leiderman, Asst. Dist. Atty. Gen., Jasper, for defendant in error.

DAUGHTREY, Judge.

## OPINION

The defendant, John C. Pyburn, was indicted for second degree murder in the Marion County Circuit Court, and upon his conviction of this offense, he was sentenced by the jury to life imprisonment.

On appeal the defendant raises multiple assignments of error which address themselves to three main issues: (1) the sufficiency of the evidence to support the verdict, in light of the defendant's interposed defense of insanity; (2) the admissibility of certain statements made by the defendant shortly after the event; and (3) alleged prejudice to the defendant resulting from an improper question by the prosecutor asked of the defendant on cross-examination. For the reasons set out below, we find no reversible error on any of these grounds and accordingly we affirm the judgment of the trial court.

## I

A review of the record indicates that on the evening of September 11, 1974, the victim, Mr. James Uselton, was on duty at the Whitwell, Tennessee City Hall, acting as part time jailer and police dispatcher. At about 10:00 P.M. he received almost instantly fatal injuries from a .357 magnum pistol fired through an outside door into the police department office, the shots striking him at close range in the back and chest area and in both arms. There were no other persons in the building at the time of the shooting, and no direct eyewitnesses.

Later the same night the defendant was found by a Sequatchie County deputy sheriff standing beside his stalled automobile on a rural highway. He told the deputy that he was out of gas. The officer determined that the defendant was under the influence of alcohol, although not "falling down drunk," and intended to arrest him for public drunkenness. At this point the defendant mentioned the name of one Kelsey Griffith, for whom he did part time work re-

pairing guns. At the defendant's request the officer agreed to go and get Griffith and bring him to the scene, which he did. After a conversation between Griffith and the defendant, the defendant was allowed to leave with Griffith.

Kelsey Griffith, a Dunlap, Tennessee gun dealer, testified that as he was taking the defendant to his automobile, he "felt a weapon" and took from the defendant a .357 magnum pistol which he put under the driver's seat of the car. Griffith then testified:

. . . I went back and helped the deputies push (the defendant's) car out of the road. And when I got back in (my) car with Mr. Pyburn, I asked him jokingly like you know, since I had found the gun I asked him, I said, what've you been doing Johnny, playing Gunsmoke? And he said, I think he said, hell yes . . . I shot up Whitwell, and I said what do you mean you shot up Whitwell? He said, I shot up the jail down there. . . So then I stated to Mr. Pyburn, I said, "Johnny, do you know you killed the jailer down at Whitwell? And he said, "Did I?" or "I did?" And I said, "You sure did feller." And he just laughed. . . .

The defendant also told Griffith that he had been "eating pills and chasing it with beer."

At this point in route to the defendant's home, Kelsey was near his brother Bobby Griffith's home, and decided to stop and tell Bobby, a Sequatchie County deputy sheriff, what he had just learned from the defendant. He awakened his brother and standing in the living room "told him that Johnny was outside in my car and I believed that he might be involved in the incident in Whitwell," which the Griffith brothers had learned of sometime earlier that night.

Bobby Griffith returned to his bedroom to dress, and as he emerged he found the defendant standing in the living room. Bobby Griffith testified:

. . . I asked Mr. Pyburn what he's doing up at this time of night. And he told me . . . (h)e'd went to City Hall in Whitwell, Tennessee and asked the jailer if he had his friend Ott Higdon

in jail? And the jailer said no, and slammed the door in his face, and he stated that he had shot through the door three times and he said I might have killed the son of a bitch. . . . And then he handed me a .357 magnum pistol . . . (from) under his belt.

Bobby Griffith also identified the .357 magnum pistol previously made an exhibit to the State's case as the gun he received from the defendant that night, and which the defendant presumably had retrieved from the floorboard of Kelsey Griffith's car while Kelsey was out of his automobile. Bobby Griffith said that he inspected the gun at the time and found that three cartridges had been fired and three were unfired. He then transported the defendant to the Sequatchie County Jail, arriving sometime just after midnight.

There were two witnesses called by the prosecution who testified to being with the defendant in the early evening hours of the same night. One of these witnesses had seen the defendant drinking beer. The other had not, but testified:

. . . there was something wrong with him, I don't know if he was drinking or what, but I knew there was something . . . he mumble(d) . . . (he was) dozy . . . his eyes was awful red. . . .

The other witness testified that the defendant was having great difficulty driving and that it appeared "his mind wasn't right." This witness admitted that he had told an agent for the Tennessee Bureau of Investigation that he thought the defendant was on "dope" that night, but said he didn't see the defendant take any pills.

A .357 caliber bullet had been removed from a rear wall in the police department, and it was stipulated at trial that comparison tests run by a ballistics expert indicated this slug had been fired from the same pistol given by the defendant to Bobby Griffith on the night in question.

The defendant took the stand in his own behalf and, probably to the surprise of his attorney, denied having shot into the Whitwell jail, and initially denied ever having

seen the .357 magnum pistol placed in evidence at trial. He testified that he had little or no memory of anything occurring between 8:00 P.M. on September 11 and 3:30 A.M. or so the next morning when he "came to (him)self". He attributed his lack of memory to a blackout like those he frequently suffered, and said he had a headache earlier in the day, for which he had taken some pills. According to the defendant, he took "a half dozen each or more" of Valium 5 pills, Valium 10 pills and Librium pills, later described by an expert witness as addictive, tranquilizing drugs. The defendant testified that the pills had been prescribed for a nervous condition, and that he was supposed to take only three a day. By his count, he had taken at least 12 and possibly as many as 18 or more on the day in question. He could remember drinking no more than two beers during that day.

The defendant admitted being jailed some nine months prior to September 11, 1974, in the Whitwell jail, with a friend named Ott Higdon, the two of them having been arrested and held overnight for disorderly conduct and public drunkenness. On cross-examination he was asked about serving a penitentiary sentence in the state of Michigan. He denied this fact, and no objection was made to the question.

The main defense witness was Dr. James S. Cheatham, a psychiatrist of twenty-two years experience, with particular expertise in the area of criminal psychiatry. He had observed and examined the defendant over a total period of five hours on December 12, 1974, January 20, 1975, and February 17, 1975, the last date falling in the week immediately before the trial occurred. He testified that the defendant suffered from generalized arteriosclerosis, or hardening of the arteries, with some resulting eye and brain damage. The defendant had previously required arterial surgery in his leg for a clotting condition which was also the result of this disease. The doctor further testified:

.   .   .   it is obvious that Mr. Pyburn suffers from an organic brain syndrome which is an impairment of his mental functions due to physical factors, some physical disturbance of the brain   .   . substantially the result of severe generalized hardening of the arteries (and) chronic alcoholism for about thirty years duration   .   .   . (He is) poorly orientated as to time, place, circumstances, his intellectual processes are dull, his thinking is very concrete, his memory for past events is quite good, for intermediate events is fair and for recent events is very poor, for instance, Mr. Pyburn has never been able to comprehend my name. He is unable to relate to me accurately the date of the incident with which he is charged   .   .   . (and) stated to me he could not exactly recall the events or the sequence of events on that date.   .   . He did recall that   .   .   . he had been drinking and had also taken a large quantity of medications which had been prescribed for him.   .   .   . (H)e says the last thing he can remember was somewhere about 8:00 P.M., and that was of going to some friend's residence to get the bow of the fiddle, and then he says he doesn't remember anything until he came to about three o'clock the next morning. It is my opinion that this is a legitimate amnesia (common to persons suffering from severe arteriosclerosis).

The doctor concluded that on the night of the shooting the defendant was "insane and incompetent," that he was unable to recognize the nature or quality of the act of which he was accused, and that he would not have had the "mental capacity to understand the meaning of the words he uttered or to make rational utterances concerning the alleged event   .   .   .." The doctor testified, however, that although the defendant continued to suffer from brain damage caused by arteriosclerosis and the effects of alcoholism on the occasions he was seen by the doctor in December, January and February, the defendant was not insane on these subsequent dates. Asked by the trial judge whether the defendant was unaware of what he was doing at the time of the shooting, or whether he was simply unable to recall it later, the doctor gave no conclusive answer, but attempted

in his testimony to equate the two phenomena.

On the issue of evidentiary sufficiency, there is certainly overwhelming evidence in the record to support the conclusion that the defendant committed the act of which he is accused, despite his denial from the witness stand. The only substantial evidentiary question raised on appeal relates to the sufficiency of the State's evidence to establish the defendant's sanity at the time he committed this act.

■ Under well-settled Tennessee law, the presumption of sanity places the initial burden of showing insanity at the time of the commission of a crime upon the defendant. While the prosecution is not bound to establish the defendant's sanity in the first instance, if the defendant's or the State's evidence raises a reasonable doubt as to the defendant's sanity, the defendant is relieved of further proof upon that issue and the burden of proof shifts to the State to establish the defendant's sanity beyond a reasonable doubt. *Collins v. State,* 506 S.W.2d 179 (Tenn.Cr.App.1973). We think the issue of the defendant's sanity was sufficiently raised by the defendant's case, primarily from the expert testimony of the psychiatrist, Dr. Cheatham. The burden therefore shifted to the State to establish the defendant's sanity beyond a reasonable doubt, and the prosecution did so to the satisfaction of the jury. The issue of insanity being a question of fact for the jury, *Spurlock v. State,* 212 Tenn. 132, 368 S.W.2d 299 (1963), the jury's verdict accredits the witnesses for the State and resolves all disputes in favor of the State's theory. *McBee v. State,* 213 Tenn. 15, 372 S.W.2d 173 (1963). On appeal, the defendant has the burden of demonstrating the preponderance of the evidence in his favor, and this we think he has failed to do on the record before us.

■ The defendant in his brief takes the position that the lay testimony presented by the State should be ruled insufficient as a matter of law to rebut the expert testimony offered by the defendant, citing us to the dissent in *Meade v. State,* 484 S.W.2d 366 (Tenn.Cr.App.1972). But the dissent in *Meade* correctly notes that the "weight and value of expert testimony is for the jury and must be received with caution, and that where there is any conflict between expert testimony and non-expert testimony as to determinative facts, the jury is not bound to accept expert testimony in preference to other testimony and must determine the weight and credibility of each in light of all the facts shown in the case." *Id.* at 371 (Oliver, J., dissenting); *accord, Sparkman v. State,* 469 S.W.2d 692 (Tenn.Cr.App.1970), *Humphreys v. State,* 531 S.W.2d 127, 131–32 (Tenn.Cr.App.1975). To adopt as conclusive the rule here urged by the defendant would be to usurp completely the function of the jury in determining the issue of insanity.

■ Of course, it is also settled law that a non-expert witness offered to establish the sanity of a person must show such acquaintance with that person and such opportunity of observing him as to enable the witness to form a definite opinion. *Humphreys v. State, supra,* at 135. This requirement would be especially compelling where, as here, the State offers only lay testimony in the face of expert testimony presented by the defense. But we think the facts here indicate that the lay witnesses were fully competent under the law to give opinions as to the defendant's condition.

■ Furthermore, we think the record indicates that the expert's testimony, while sufficient to shift the burden of proof to the State, failed to establish the defendant's insanity at the time the crime occurred, but instead tended to establish that the defendant was voluntarily under the influence of both alcohol and narcotics. Great emphasis was placed by the psychiatrist on the defendant's alleged amnesia, but under the law the professed inability of the defendant to remember the crime is not by itself proof of insanity. *Burton v. State,* 217 Tenn. 62, 394 S.W.2d 873 (1965); *Sparkman v. State, supra,* at 696–97.

The psychiatrist testified to four factors which he found to have caused the defendant's mental impairment amounting to in-

sanity at the time of the crime: (1) arteriosclerotic disease and (2) chronic alcoholism, both of which contributed to brain damage; (3) the defendant's alcoholic intake on the day in question, which the doctor opined was a "substantial amount;" and (4) the tranquilizing drugs taken by the defendant on that date. The doctor stated "conclusively that (the defendant's) mental impairment, his mental disrangement was at that time a summation of *all of these factors*" (emphasis supplied). Quite obviously, the defendant was not insane in the doctor's opinion when examined sometime after the crime because of the absence of the last two factors, *i. e.,* the alcohol and drugs. We think that based on the psychiatrist's testimony alone the jury was justified in finding that the defendant was intoxicated rather than insane at the time the crime occurred. There is ample other evidence in the record pointing to the same conclusion, and "where testimony as to the facts permits even an inference that the defendant was sane at the time of the offense charged, the jury is entitled to reject expert and lay opinion testimony to the contrary." *Brooks v. Rose,* 520 F.2d 775, 778 (6th Cir.1975).

██ The law is well settled that voluntary drunkenness is no defense to a charge of second degree murder. *Simpson v. State,* 1 Tenn.Cr.App. 256, 437 S.W.2d 538 (1968). *See also, Collins v. State, supra,* at 184, involving facts virtually identical to the ones before us. We think the record clearly preponderates in the State's favor on the issue of the defendant's insanity, and we therefore find no error in the jury's verdict nor in the trial court's failure to direct a verdict on the issue of malice. *See Simpson v. State, supra; Bostick v. State,* 210 Tenn. 620, 360 S.W.2d 472 (1962); *Bailey v. State,* 479 S.W.2d 829 (Tenn.Cr.App. 1972); *Humphreys v. State, supra,* at 132–33.

## II

██ The second issue raised by this appeal involves the admissibility of three statements made by the defendant on the night of the shooting to Kelsey Griffith, to Bobby Griffith, and to an investigator from the local District Attorney's office. The defendant complains that the three statements are inadmissible because he was incompetent at the time to make a valid confession, by reason of his insanity. We have already determined that the record preponderates against the defendant on the sanity issue. Furthermore, intoxication is not necessarily a bar to a valid confession. *Williams v. State,* 491 S.W.2d 862, 866 (Tenn.Cr.App.1972). A jury-out hearing was held as required by law, prior to the trial court's ruling on the motion to exclude all statements made by the defendant on the basis of incompetency, and the court ruled that the statements were admissible. On appeal the record must preponderate against the ruling of the trial judge in order to support a finding of error. *Wooten v. State,* 203 Tenn. 473, 314 S.W.2d 1 (1958); *May v. State,* 4 Tenn.Cr.App. 555, 474 S.W.2d 172, 178 (1971). We think the defendant has failed to carry his burden on his point.

██ Next the defendant assigns as error the admission of the statements made to Bobby Griffith and to the State investigator on the grounds that the defendant's *Miranda* rights were violated.[1] As to the statement to Griffith, no prior *Miranda* warning was given the defendant, but none was required. The circumstances wholly fail to establish that the defendant was in custody and under interrogation. *United States v. DeBose,* 410 F.2d 1273 (6th Cir. 1969), *cert. denied,* 401 U.S. 920, 91 S.Ct. 906, 27 L.Ed.2d 823 (1971); *Braziel v. State,* 529 S.W.2d 501, 506–07 (Tenn.Cr.App.1975), and cases cited therein. The statement appears to have been volunteered, and the totality of the circumstances more closely approximates general on-the-scene questioning than it does custodial interrogation of one upon whom the investigation has focused.

The question presented by the introduction of the defendant's statement to the State investigator raises a more difficult

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

question under the *Miranda* standard. As the State's brief points out, after arriving at the county jail in Dunlap, and before interrogation began, the defendant was advised of his rights under *Miranda* and executed a written waiver of those rights. In a regrettable lack of candor, however, the State's brief fails to note that after answering a few questions the defendant apparently changed his mind about the waiver and asked for a lawyer. The investigator, ignoring the defendant's thus revived *Miranda* right to have questioning cease until a lawyer was made available, continued interrogation of the defendant and elicited a statement tending to prove fairly conclusively that the defendant committed the shooting earlier that night. For a second time the defendant requested an attorney, and the transcript shows that he answered no further questions. It should be noted at this point that although the defendant's statement on this occasion was somewhat more detailed than the admission which he had made earlier to Bobby Griffith, there was no factual variation in the two statements.

█ The prosecutor apparently recognized that the statement given at the jail was fatally tainted under *Miranda* and made no attempt to introduce or allude to it on direct. However, once the defendant took the stand and denied commission of the crime, and further denied any memory of making a statement at the Dunlap jail, the statement became admissible for purposes of impeachment. *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975). Before such a *Miranda*-tainted statement can be introduced, however, certain *Harris-Hass* requirements must be met: the statement attributed to the defendant by the prosecution is admissible only to impeach the defendant's credibility, and the jury must be instructed that the statement can be considered only in passing on the defendant's credibility and not as evidence of guilt. The problem here is that the trial court ruled the statement admissible not on the question of credibility, but on the issue of the defendant's sanity. The judge then instructed the jury:

> As I understand the testimony of this witness, members of the jury, it is to be in reference to a statement alleged or certain statements alleged to have been made by the defendant, and this testimony is being admitted only for one purpose and for one purpose only, and that is for consideration as to the question of sanity or insanity, and it's not to be considered in any other respect. It's (In?) reflecting on whether or not the defendant may or may not have committed (the crime?) itself, you're to consider this statement only in determining whether or not the defendant was sane or insane at the time of the alleged criminal acts. . . .

█ Undoubtedly the trial judge believed he was instructing the jury not to take the statement as evidence of defendant's guilt or innocence, and made efforts in that direction to the extent of his reference to the actual commission of the crime. But the issue of the defendant's sanity or insanity was clearly the *determinative factor* in establishing guilt or innocence, and thus it necessarily follows that under this instruction the statement could be used as evidence of the defendant's guilt. We think this aspect of the charge, together with the court's failure to restrict the use of the evidence to impeachment of the defendant's credibility, constitutes error under *Harris* and *Hass.* We can find no authority for the trial court's action in this case, with the exception of one Tennessee decision, *Collins v. State, supra,* at 186. But the *Miranda* violation in *Collins* which brought *Harris* into play fell under Footnote 37 of the *Miranda* opinion, and in view of the Tennessee Supreme Court's recent decision in *Braden et al. v. State,* 534 S.W.2d 657 (1976), we decline to follow *Collins* here.

The question then becomes whether or not this error was harmless given the circumstances of the case. We conclude that it was.

The State did not introduce the entire statement in question upon cross-examination of the defendant, but alluded to it in

laying the foundation for its later introduction. The next mention of a statement allegedly given by the defendant to the investigator was made by defense counsel upon direct examination of the psychiatrist, Dr. Cheatham. After the defense rested its case, the State introduced the investigator in rebuttal and, following the court's cautionary instruction set out above, this witness testified to the circumstances and general content of the defendant's statement to him. At this point in the trial, the State in its effort to discharge its burden of proving the defendant sane beyond a reasonable doubt had introduced abundant, clear and certain evidence that at the time of the offense the defendant was under the influence of alcohol and drugs. Lay witnesses had testified, as they were competent to do, to the defendant's behavior, manner of speech, and mental comprehension shortly after the occurrence. Such facts have been recognized as "the best evidence of whether (the defendant) was or was not of rational mind at the time of the crime." *Mullendore v. State*, 183 Tenn. 53, 191 S.W.2d 149, 151 (1945). Thus the evidence in the statement in question, if the jury wrongfully considered it, was no more than cumulative.

Our conclusion that the error was harmless is further buttressed by the fact that the first effort to tie the statement to the issue of insanity was made not by the State on cross-examination of the defendant (wherein the issue was properly confined to credibility alone), but by the defendant on direct examination of the psychiatrist. He was asked by defense counsel whether the fact that the defendant had given a detailed statement at the jail shortly after the event would alter his opinion as to the defendant's competency. Thus the issue of what use could properly be made of this evidence was arguable foreclosed by the defendant's "opening up" of the question. We think that, beyond a reasonable doubt, the overall record fails to demonstrate prejudice to the defendant arising from this assigned error.

In a final attack on the admissibility of the statement to the investigator, the defendant alleges a violation of T.C.A. § 40–2441 because the prosecutor failed upon timely demand to supply the defendant with a copy of the statement attributed to him at trial. The State argues that the confession became admissible upon rebuttal regardless of the dictates of § 40–2441. We do not necessarily read such an exception into the statute, but we do think that any error in admitting the statement was at most harmless, because of its thoroughly cumulative nature. *See, e. g. Berry v. State*, 523 S.W.2d 371 (Tenn.Cr.App.1974); *O'Dear v. State,* 516 S.W.2d 622 (Tenn.Cr. App.1974).

It then becomes pertinent to inquire whether the existence of *two* harmless errors in this record has the necessary effect of creating overall prejudice to the defendant. We conclude that it does not. The prosecution recognized the *Miranda*-tainted nature of the statement and knew the statement was inadmissible on direct. Probably in an effort to keep his cards close to his chest, a time-honored litigation tactic, the prosecutor decided not to supply the defendant with a copy of what he considered to be an inadmissible statement. We think this violates the spirit if not the letter of the statute, and that such a niggardly practice flies in the face of the announced trend toward more liberal discovery in this state. *See, State v. Gaddis*, 530 S.W.2d 64 (Tenn.1975); Proposed Rules of Tennessee Procedure, promulgated by the Supreme Court's Commission on Rules of Practice and Procedure in Criminal Cases, R. 16. It also produces unnecessary litigation, especially where as here there was no new or inconsistent information in the statement. The prosecution had nothing to lose in supplying the statement, but correspondingly the defendant had nothing to gain. We think there was essentially one error here, which had both constitutional and statutory ramifications. We are satisfied that it did not effect the outcome of the trial.

III

The final issue raised on appeal involves an allegedly improper question put

to the defendant by the prosecutor on cross-examination. Asked if he had ever served a penitentiary sentence in Michigan, the defendant replied in the negative. He now alleges prejudicial inference by the jury drawn from an implicit, unsubstantiated insinuation by the State. But because no objection was entered to the question, the record fails to disclose whether the inference could be substantiated by the prosecutor or not, and under the circumstances the State was bound by the defendant's answer. In the absence of timely objection at trial, the defendant will not be heard to complain on appeal.

For the foregoing reasons, the judgment of the court below is affirmed.

WALKER, P. J., and RUSSELL, J., concur.