# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

### JUNE SESSION, 1998



**FILED**

**August 21, 1998**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 02C01-9709-CR-00362** |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | **SHELBY COUNTY** |
| **VS.** | ) | |
| | ) | **HON. CHRIS CRAFT** |
| **CHARLES GOLDEN,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | **(First-Degree Murder)** |

## ON APPEAL FROM THE JUDGMENT OF THE
## CRIMINAL COURT OF SHELBY COUNTY

FOR THE APPELLANT:

STEFFEN G. SCHREINER
369 N. Main
Memphis, TN

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

PETER M. COUGHLAN
Assistant Attorney General
425 5th Avenue North
Nashville, TN 37243

WILLIAM L. GIBBONS
District Attorney General

PHILLIP GERALD HARRIS
JERRY KITCHEN
Assistants District Attorneys General
Criminal Justice Complex, Suite 301
201 Poplar Street
Memphis, TN 38103

OPINION FILED _____

CONVICTION AFFIRMED; REMANDED FOR RESENTENCING

DAVID H. WELLES, JUDGE

# OPINION

The Defendant, Charles Golden, pursuant to Tennessee Rule of Appellate Procedure 3(b), appeals as of right his conviction of first-degree murder and sentence of life imprisonment without the possibility of parole. Defendant asserts five claims of error: (1) that Defendant could have been guilty of only second-degree murder because he lacked the specific intent for first-degree murder; (2) that the court should have granted Defendant's requested jury instruction concerning his mental condition; (3) that the court improperly instructed the jury concerning reasonable doubt; (4) that the court improperly instructed the jury concerning the unavailability of a defense of duress; and (5) that the court improperly instructed the jury concerning when Defendant would be eligible for release on parole if sentenced to life imprisonment. Although we affirm the conviction, we remand for resentencing due to the inaccuracy of the parole eligibility jury instruction.

Defendant was indicted by the Shelby County Grand Jury on October 31, 1996, on a charge of first-degree murder in violation of Tennessee Code Annotated § 39-13-202. Judge Chris Craft of the Criminal Court for Shelby County appointed counsel for Defendant and presided over his trial on March 17-19, 1997. Following jury verdicts on guilt and sentencing, the court entered a judgment of conviction and sentence of life imprisonment without the possibility of parole. Defendant's Motion for New Trial was overruled on April 18, 1997, and he timely appeals.

At trial the State presented proof that Defendant shot and killed Sergeant Deadrick Taylor, a deputy jailer for the Shelby County Sheriff's Department, when Taylor returned to his home after work. Sergeant Taylor arrived home at his usual time; but before he was able to enter his house, Defendant shot Taylor beside his car. The victim's wife heard her husband drive into the carport area and then heard "nothing but gunfire." As the gunfire continued, she rushed outside but initially could not see anything but smoke. She then saw her husband crawling toward the house and she assisted him inside. Taylor died at the hospital approximately forty minutes later of internal bleeding caused by two gunshot wounds to the midsection—one which injured rib, liver, colon, and small intestine; and another which injured rib, spine, and diaphragm. Both wounds were of the type "generally associated with a high index of pain," and each wound was caused by a .38 caliber bullet.

The State presented an inmate at the Shelby County jail, who testified that he and Defendant were members of a gang called the Traveling Vice Lords (TVL). The witness stated that the gang was controlled by Charles Thompson, also incarcerated in the jail, and that members of the gang receive elevated rank and status by following Thompson's orders.

This witness also testified that on the day of Sergeant Taylor's murder, Charles Thompson and another TVL member engaged in a fight with two other inmates prior to Sergeant Taylor's shift. All prisoners were "locked down" in their cells at 1:00 p.m. that day, as is usual practice during a shift change; but when Sergeant Taylor began his shift, the inmates remained locked down because of the earlier fight. Once released from lock-down, TVL leader Thompson argued

with Sergeant Taylor about the extended confinement and repeatedly declared, "You don't know who the f_ _k I am."

According to the witness, Thompson telephoned "Verico"[1] following the argument and asked why Sergeant Taylor had not yet been killed, calling Taylor by name and stating angrily,

> What's the mother-f_ _king hold-up?  Why can't you do what the f_ _k I tell you to do?
>       . . .
> When I tell you to kill the mother f_ _ker that's what I mean, not tomorrow, when I say it. . . . [Y]'all right over there with him and y'all can't get the mother f_ _ker.
>       . . .
> I want to hear about it on the news tomorrow.

The witness also testified,

> I didn't understand what was going on for the fact he had just got in an argument with the man, and then he hop on the phone. So when he was telling—when he was saying all this, later on when we got locked down I was in my cell I said to myself they must have already been planning to kill the man because the argument just happened . . . .

Finally, this witness agreed on cross examination that if a member of the TVL gang failed to do what Thompson ordered, the person might be hurt or killed.

The State presented another witness who testified about events on the same day outside the jail.  The witness was present when Verico Jackson received a telephone call, which he answered in a back room alone.  At this location—a house only a couple of streets from Sergeant Taylor's residence—the witness saw several weapons, including a .25, .38, an SKS with a long clip, and a .22 with a scope.  When the phone call concluded, Verico called Defendant,

---

[1] Verico Jackson is brother to Mario Jackson, the inmate who joined Charles Thompson in the prison fight against two other inmates.

Rory Haywood, and "Cookie Monster," another TVL member, into the back room. The four gang members and others present, including the witness, left this house and Verico said, "Let's go gang-banging." Defendant, Verico, Rory, and "Cookie Monster" drove away in a car; and the witness saw the car stop on Sergeant Taylor's street. "Cookie Monster" obtained the SKS and the .38 from under the hood of the car and handed the .38 to Defendant. The two then walked away, leaving Rory in the driver's seat. About five minutes later, the witness heard "a lot of gunshots"—specifically, "about three regular gunshots . . . a lot of loud gunshots and then some more like quieter gunshots." Later, the witness heard Verico thank Defendant "for taking care of their business," and Defendant stated, "[T]hat whore-ass nigger shouldn't have got my nigger jumped on."

Following his arrest, Defendant made a voluntary statement in which he validated the above facts, except that Charles Thompson had called on April 18 with the order to murder Sergeant Taylor. Defendant stated that Verico told him killing Taylor was "Nation Business," and when Defendant tried to "punk out and not do[] it," Verico told him that he must do it because it was Nation Business. Defendant came back to the house the next day, they discussed the plan as early as 2:00 p.m., and they carried out the plan the evening of April 19 at approximately 10:40 p.m., after waiting for Taylor to arrive at his home. Then, according to Defendant,

> "Cookie Monster" said, go on. So I walked up in back of Sergeant Taylor. He was out of the car. I said, hey. And Sergeant Taylor looked at me, and I fired three or four times toward Sergeant Taylor holding the gun gangster style (meaning the gun was turned toward the side instead of the traditional firing of the gun; it was turned toward the side).
> I turned and ran along the path to where "Cookie Monster" was with Rory. And "Cookie Monster" had the AK, and Rory had the .25 automatic. And I passed the .38 to Rory. As I was running

toward Kansas [Street] and "Cookie Monster" started firing the AK as I was running. I ran up on Kansas . . . and Rico came out and asked if the job was done. And I said, yeah.

At approximately 2:00 a.m., after the shooting, Defendant and others started smoking [marijuana] and celebrating." No one was "promoted" within the gang, but Defendant heard rumors that Charles Thompson intended to pay him for the murder.

Later in his statement, Defendant said he wanted to tell Sergeant Taylor's wife that he was sorry for what happened and that he "did not shoot her husband." In addition,

> I didn't have no choice but to do what they thought I did 'cause they said—they—if I didn't they would go to my family or they would shoot me right there. I was in fear of my life and my family's life if I didn't participate in this act.

## I.

Defendant's first argument is that he lacked the specific intent for first-degree murder and, therefore, could only have been convicted of second-degree murder. He contends that the defense of duress applies to negate his intent to kill because he feared for his life and the life of his family at the time he committed the offense. We read Defendant's argument as presenting two separate but related assertions: First, the trial judge as a matter of law should have excluded first-degree murder from the jury's purview. Second, a jury could not have concluded that Defendant was guilty of first-degree murder.

We examine the second assertion first and conclude that the State presented sufficient evidence to support his conviction by the jury. "[F]indings of

guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). Conversely, therefore, a jury verdict should stand so long as the evidence is sufficient to support the finding of guilt beyond a reasonable doubt. Defendant's conviction destroyed his presumption of innocence and instated a presumption of guilt in its place. See McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992) (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1976), and State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977)); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Holt v. State, 357 S.W.2d 57, 61 (Tenn. 1962).

Upon examination of the record, it is apparent that some discrepancies exist between the testimony of the State's witnesses and Defendant's statement concerning what day Charles Thompson made the telephone call "ordering" Sergeant Taylor's assassination. This Court must resolve any conflicts in testimony in favor of the jury verdict. See Tuggle, 639 S.W.2d at 914. However, with respect to the issues presented by the conflict, Defendant's statement actually tends to show greater premeditation and less coercive influence, in support of the State's case.

In this case, the State provided ample evidence by which a jury could find that Defendant acted with the requisite mens rea to commit first-degree murder. By Defendant's own statement, the gang decided to murder Sergeant Taylor on April 18, 1996. Members discussed what weapons they would use and planned a course of action. Defendant stated that he went home on the evening of April 18 and returned midday on April 19, when he and others discussed the murder

again and prepared to ambush Sergeant Taylor when he arrived home from work. Defendant stated that he then walked toward Taylor and immediately shot at him three or four times.

Furthermore, the jury was entitled to find Defendant guilty of first-degree murder despite his argument that the murder was committed under the duress of believing that the TVL gang would kill him or his family in retaliation for failing to carry out "Nation Business." As defined by the legislature and charged by the trial court,

> Duress is a defense to prosecution where the person or a third person is threatened with harm which is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.

Tenn. Code Ann. § 39-11-504(a). Here, the evidence as recounted above demonstrates the lack of a present, imminent, impending, and continuous threat of harm. At best, the jury was presented a generalized apprehension that Defendant or Defendant's family might have been hurt somehow, at some unknown point in the future. Even if the jury found a satisfactory threat of harm, it was certainly entitled to conclude that the desirability of avoiding gang retaliation did not outweigh the harm of killing Sergeant Taylor.

Having so concluded, we also find that the trial judge was under no duty to withdraw the charge of first-degree murder in favor of lesser-included homicide offenses. Prior to exercising the function of thirteenth juror, a trial judge may

-8-

weigh the evidence only (1) to determine whether the State has proffered sufficient evidence, as a matter of law, for the jury to consider the charge; and (2) to determine whether a defendant has proffered sufficient evidence, as a matter of law, for the jury to consider the defense.[2] See, e.g., State v. Underwood, 669 S.W.2d 700, 702-03 (Tenn. Crim. App. 1984) ("The defendant's defense of alibi presented a factual issue for the jury to determine."); State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982) ("The defense of alibi presents an issue of fact determinable by the jury, as the exclusive judges of the credibility of the witnesses in support of that defense, and of the weight to be given their testimony.") (citing Green v. State, 512 S.W.2d 641 (Tenn. Crim. App. 1974)).

In this case, we have already concluded above that the State bore its burden of persuasion; therefore, we must conclude that the State bore its burden of production, and that the trial court was correct in allowing the charge of first-degree murder to be decided by the jury.

II.

We consider Defendant's second and fourth issues together: that the court should have granted his specific jury instruction and that the court improperly instructed the jury on the unavailability of duress as a defense. Generally, a jury

---

[2] Because duress is not an affirmative defense, Defendant was not required to prove the defense by a preponderance of the evidence. State v. Culp, 900 S.W.2d 707, 710 (Tenn. Crim. App. 1994). He need only have "fairly raised" the issue in order to require the trial court to submit the defense to the jury. Id.; see also State v. Scotty S. Davenport, C.C.A. No. 01C01-9611-CR-00477, Davidson County (Tenn. Crim. App., Nashville, Feb. 18, 1998). Because the trial court instructed the jury on duress, we need not decide whether Defendant actually met his burden of production on the defense.

charge "should be considered prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997) (citing State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995), and Graham v. State, 547 S.W.2d 531 (Tenn. 1977)).

In addition, "[i]t is the duty of a trial judge to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986) (citing State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975)); see State v. Burkley, 804 S.W.2d 458, 461 (Tenn. Crim. App. 1990). This Court also stated in Burkley, "In delivering its charge, a court should guard against an instruction which would withdraw from the jury's consideration any issue or evidence which they are entitled to consider." 804 S.W.2d at 461.

Defendant argues that the trial judge erred in instructing the jury that duress is "unavailable to a person who intentionally, knowingly, or recklessly becomes involved in a situation in which it was probable that the person would be subjected to compulsion." The offensive instruction, however, is the second tenet of the statutory defense of duress. Tenn. Code Ann. § 39-11-504(b). In order to justly discern when the defense is available and proper, a jury must necessarily know when it is statutorily unavailable to a defendant; and without this instruction, the trial court's charge would not have been a complete and accurate statement of the law.

Defendant also appeals the trial court's failure to grant his request for a specific jury instruction on the defense of duress. Defendant's proposed instruction was submitted as follows:

> Ladies and gentlemen of the jury, I further instruct you that in regards to the Law of Second Degree Murder, the defendant may be convicted of the Law of Second Degree Murder if you find from all the proof in the record that the defendant's fear for his life so clouded his judgment that he was incapable of reason and therefore, was incapable of forming the necessary pre-meditated intent necessary to constitute the Law of Murder in the First Degree. The difference in Murder in the First Degree and Murder in the Second Degree is that of pre-meditation. Before a defendant can be convicted of Murder in the First Degree, he must have the mental capacity, free from any kind of outside influences, in order to have the capacity to form the necessary criminal intent pre-requisite to be guilty of Murder in the First Degree.
>
> If you have reasonable doubt that the defendant's mind was so influenced by fear for his life then you must find the defendant guilty of only Murder in the Second Degree. (Pirtle v. State, 28 Tenn. 663; (1989); State v. Keeds, 753 SW2d, 140 (1985); State v. Adkins, 653 SW2d 708 (1983).

Because Defendant failed to "fairly raise" the issue of his mental capacity, because we find that his instruction is not a clear and accurate statement of the law, and because the trial court indeed used an adequate instruction, we conclude that the trial court properly rejected its inclusion in the charge.

Although it is somewhat unclear, the trial judge in this case assessed that Defendant was, in essence, arguing diminished capacity by likening his fear of harm to intoxication; and we will therefore address the issue as such. Our legislature has mandated, and the courts of this state have recognized, that although intoxication is not a defense to prosecution, evidence of intoxication can negate a finding of specific intent to commit a crime. Defendant in this case seems to contend that, although he cannot fulfill the requirements of a statutory defense of duress, evidence of his duress can nevertheless negate his specific intent to commit murder. We cannot agree.

-11-

First, no evidence in the record exists to support a finding that Defendant was "so clouded [in] his judgment that he was incapable of reason"—in fact, the evidence is wholly contrary. Second, no court of this state, to our knowledge, has extended the doctrine of diminished capacity to simply a coercive situation, and we decline to do so now. Our legislature has prescribed, in painstaking detail derived from the common law, precisely when a criminal defendant can be considered to lack the specific intent to commit an offense due to duress. See Tenn. Code Ann. § 39-11-504. This instruction declares that a criminal defendant cannot be convicted of first-degree murder even when the apprehension of a threatened harm is not present, imminent, impending, or continuous. Therefore, Defendant's requested instruction is not a fair, complete, or accurate statement of the law. Finally, we find the trial court's instructions on duress and the mental state required for first- and second-degree murder sufficient. When "the matter ha[s] been fully and adequately covered in [the] general charge," a trial judge possesses the discretion to deny specifically requested instructions. Bostick v. State, 360 S.W.2d 472, 477 (Tenn. 1962); see also Edwards v. State, 540 S.W.2d 641, 649 (Tenn. 1976) ("It is not error to refuse a special request where the charge as given fully and fairly states the applicable law."); State v. Blakely, 677 S.W.2d 12, 18 (Tenn. Crim. App. 1983). Defendant's second claim of error lacks merit.

III.

Defendant's next assignment of error is that the court improperly charged the jury that "absolute certainty" is not required to convict a criminal defendant beyond a reasonable doubt. The instruction as given reads:

Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily upon the certainty of guilt. Reasonable doubt does not mean the doubt that may arise from possibility. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required as to every proposition of proof requisite to constitute the offense.

(Emphasis added).

Defendant's argument must fail. We have in the past concluded that this instruction is permissible and that there are no constitutional impediments to its use. See State v. Willie Taylor, C.C.A. No. 02C01-9702-CR-00080, Shelby County (Tenn. Crim. App., Jackson, Mar. 10, 1998); State v. James Earl Somerville, C.C.A. No. 02C01-9608-CC-00289, Tipton County (Tenn. Crim. App., Jackson, Oct. 13, 1997); see also Pettyjohn v. State, 885 S.W.2d 364, 365-66 (Tenn. Crim. App. 1994) (concluding that requiring "moral certainty" was sufficient for due process especially when the concept was differentiated from "absolute certainty" before the jury). We see no reason to deviate from these decisions. Absolute certainty is tantamount to one hundred percent certainty, which the standard of "beyond a reasonable doubt" does not require.

IV.

Defendant's final issue for review is whether the trial court erred in advising the jury during the sentencing phase of the trial: "A defendant who receives a sentence of imprisonment for life shall not be eligible for parole consideration until the defendant has served at least twenty-five (25) full calendar years of such sentence." At trial defendant contended that parole eligibility instructions "should not be within the province of the jury" and are prejudicial to the defendant. We reject the argument that a parole eligibility jury instruction is generally

unconstitutional in a sentencing hearing.  *See generally* <u>State v. Cribbs</u>, 967 S.W.2d 773 (Tenn. 1998).

Unfortunately, the 25-year jury instruction was inaccurate in this case. Although Tennessee Code Annotated § 39-13-204(e)(2) specifically requires that the jury be instructed as to service of "at least twenty-five (25) full calendar years" before being eligible for parole consideration, this statutory calculation is erroneous.

An examination of both Tennessee Code Annotated §§ 39-13-204 and 40-35-501 is necessary.  Tennessee Code Annotated § 40-35-501 was amended in 1993 to specifically provide that a defendant with a life sentence will not be eligible for parole until service of "a minimum of twenty-five (25) full calendar years of such sentence."  Tennessee Code Annotated § 40-35-501(g)(1)(Supp. 1993).  Also, in 1993 Tennessee Code Annotated § 39-13-204 was amended to require that the jury be instructed that a defendant receiving a life sentence will not be eligible for parole consideration until the defendant has served "at least twenty-five (25) full calendar years of such sentence."  Tennessee Code Annotated §39-13-204(e)(2)(Supp.1993).  It is obvious that the legislature intended that the jury be instructed as to parole eligibility as calculated by Tennessee Code Annotated § 40-35-501.

Effective July 1, 1995, Tennessee Code Annotated § 40-35-501 was amended to deny release eligibility for those convicted of first-degree murder and certain other crimes.  Tennessee Code Annotated § 40-35-501(i)(1),(2)(Supp. 1995).  Only certain sentence reduction credits not to exceed fifteen percent

-14-

(15%) are allowable. As noted by the State Attorney General, for crimes committed after July 1, 1995, minimum release eligibility for a life sentence is fifty-one (51) years and not twenty-five (25) years. *See* Attorney General Opinion 97-098 (7-1-97). Unfortunately, Tennessee Code Annotated § 39-13-204 was not amended to reflect this change.

It immediately becomes apparent that the legislature in 1995 overlooked amending Tennessee Code Annotated § 39-13-204 to coincide with the 1995 amendment to Tennessee Code Annotated § 40-35-501. The statutes presently are in conflict; however, it is clear that the legislature intended to change the minimum release eligibility date for a life sentence from twenty-five (25) years to fifty-one (51) years.

The homicide at issue was committed after July 1, 1995. We, therefore, conclude that the trial court erred in informing the jury of the twenty-five (25) year provision instead of the fifty-one (51) year provision. We now examine this error to ascertain whether it was prejudicial to the defendant.

We are unable to conclude that the error was harmless in this case. The jury found that the state had established the statutory aggravating circumstance of murder for remuneration. Tenn. Code Annotated § 39-13-204(i)(4). However, it was still within the jury's discretion to sentence the defendant to either life imprisonment or life without parole. Tenn. Code Annotated § 39-13-204(f)(2). At the time of sentencing the defendant was 22 years of age.[3] He would be at

---

[3]The testimony at the sentencing hearing indicated the defendant was 22, whereas the judgment indicates the age of 23.

least 73 years of age before reaching eligibility for release for a straight life sentence under the fifty-one (51) year provision. The inaccurate jury instruction would allow for possible release at age 47 for a life sentence.

The choice between life without the possibility of parole and life with the possibility of parole is one to be made by the jury under our sentencing statute for first-degree murder. Tenn. Code Annotated § 39-13-204. It is a serious responsibility. This Court is reluctant to substitute our judgment for that of the jury where the jury was provided inaccurate information as to sentencing. In many instances, depending upon the age of the defendant, it would appear a defendant sentenced to straight life under the fifty-one (51) year provision will, as a practical matter, have the same effective sentence as life without parole. However, in this case we are unable to conclude the jury would still have chosen life without parole if it had been properly instructed. Thus, we cannot apply the harmless error doctrine in this case.

## CONCLUSION

The conviction is affirmed. The case is remanded to the trial court for resentencing for the offense of first- degree murder.

_____
DAVID H. WELLES, JUDGE

CONCUR:

_____
PAUL G. SUMMERS, JUDGE


_____
JOE G. RILEY, JUDGE