IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

**FILED**

**August 15, 1997**

**Cecil W. Crowson**
**Appellate Court Clerk**

BRYAN R. HANLEY,                    )
          Petitioner/Appellant      )      HICKMAN COUNTY
                                    )
                                    )      C.C.A. NO:
v.                                  )      01C01-9508-CC-00266
                                    )
                                    )      HENRY DENMARK BELL
STATE OF TENNESSEE,                 )      JUDGE
          Appellee                  )
_____ )


FOR APPELLANT:                      FOR APPELLEE (STATE):

DALE M. QUILLEN                     RONALD L. DAVIS
Attorney at Law                     and
95 White Bridge Rd.                 DEREK K. SMITH
Suite 208                           Assistant Dist. Attorneys General
Nashville, TN 37205                 P.O. Box 937
                                    Franklin, TN 37065-0937

                                    JOHN KNOX WALKUP
                                    Attorney General and Reporter

                                    CHARLOTTE H. RAPPUHN
                                    Assistant State Attorney General
                                    Criminal Justice Division
                                    450 James Robertson Parkway
                                    Nashville, TN 37243-0493

                                    LISA A. NAYLOR
                                    Legal Assistant
                                    Office of State Attorney General


OPINION FILED _____.


AFFIRMED

WILLIAM S. RUSSELL, SPECIAL JUDGE

OPINION

The appellant, Bryan R. Hanley, appeals from his August 12, 1994, convictions by jury verdict of the premeditated first degree murder of Timothy Tanner and the Class D felony grade theft of property. Hanley received a life sentence for the murder and a concurrent three year sentence, plus a two thousand dollar fine, for the theft conviction.

In this direct appeal, the appellant challenges the legality of the search warrant; asserts that the trial court erred in allowing the state to introduce proof of prior consistent statements of a state witness; and contends that the trial judge commented on the evidence and should therefore have granted a mistrial. We find no reversible error and affirm the convictions.

Although the sufficiency of the convicting evidence has not been challenged, a summary of the State's proof is provided to facilitate an understanding of the case under review.

Timothy Tanner, the murder victim, was a young man employed as a driver by Sayl-Co, a Dickson, Tennessee company which contracted with the United States Postal Service to pick up and deliver mail on a designated route. In mid-1991, Tanner's job was to drive a mail truck to half a dozen post offices situated from Fairview to Linden. The Bon Aqua Post Office, where the murder took place, was one of the stops on Tanner's route.

In 1982 Timothy Tanner married Beverly Tanner and subsequently the couple had a little girl. Marital problems developed and the Tanners separated in July of 1990.

During her separation from Tanner, Beverly began dating the appellant, Bryan R. Hanley, who was an acquaintance from work. Ms. Tanner filed for divorce in October of 1990 and the divorce was granted in January of 1991.

Throughout the separation and after the divorce, Beverly Tanner continued to see both Timothy Tanner and Bryan Hanley. Each man was aware of the other's relationship with Beverly.

It was Beverly's perception that when Tanner saw that she and Hanley were becoming serious about each other, and particularly when he realized she would soon be eligible to remarry, he became increasingly interested in a reconciliation. At the same time, Tanner's daughter pressured her mother to reunite the family. Ultimately, Beverly told Timothy Tanner she would give their marriage another chance if he would agree to obtain counseling. Tanner began counseling sessions and Beverly, in turn, terminated her relationship with Bryan Hanley.

During this domestic transition, animosity developed between Timothy Tanner and Bryan Hanley. The level of Hanley's hostility increased as Beverly and Tanner resumed a social relationship and began discussing remarriage.

On at least two occasions prior to Tanner's death, he and Hanley had confrontations when Hanley would show up at a post office where Tanner was working. The second encounter became heated.

In April of 1991, Hanley became convinced that Tanner had tampered with his mail, delaying the receipt of funds against which Hanley had already written checks. Hanley was enraged.

3

In May of 1991, Bryan Hanley reported to Beverly that he had seen the Tanner family at WalMart, and that Timothy had given him a "shitty" smile because he [Tanner] had won the battle for Beverly's affections.  On that occasion, Hanley followed the Tanners home.

It was also in May of 1991 that Beverly telephoned Hanley in an effort to stop him from following Tanner on his postal route. On three occasions, Hanley had pulled out of the parking lot of Rubee's bar, pulling behind Tanner's mail truck and following him. Around May of 1991, a friend of Hanley's observed that Hanley possessed a written chart of the locations and arrival times on Tanner's route.

It was also around May of 1991, when Hanley, visibly upset, remarked to a friend that he was having problems in his relationship with Beverly because Timothy Tanner was around a lot. Hanley commented that if he had blasting caps, he would blow up Tanner's vehicle.  Hanley also remarked to the same friend that Timothy Tanner must have been running late on his route on a given day, because "someone had missed him" by only five minutes.

Finally, around May of 1991, Hanley, upset, told a different friend that he really liked Beverly Tanner and did not like the fact that Timothy Tanner was interfering in their relationship. A week or two before Tanner was killed, in speaking to this same friend, Hanley threatened Tanner.

Once or twice before Timothy Tanner was murdered on June 4, 1991, Hanley told his half-brother, John David Walker, that Timothy Tanner had been giving him problems and he guessed he was going to have to kill him.

4

It was in the late afternoon of June 4 that Hanley flagged down Walker and solicited his help, supposedly to repair a video cassette recorder and a television antennae. After fifteen minutes of repair work, the two went to Rubee's bar and began drinking beer.

Rather abruptly, Hanley purchased a twelve pack of beer "to go" and he and Walker left Rubee's. They pulled out of the parking lot behind the mail truck and Hanley stated, "I'm going to fuck him up."

Hanley followed Tanner's mail truck to the Bon Aqua Post Office. While Tanner pulled around back to the loading dock, Hanley parked out front. Hanley got out of his pickup, pulled a sawed-off shotgun from behind the seat, tucking it down behind his leg, and walked around to the rear of the post office.

A couple of minutes or so later, Hanley came out from behind the post office driving Tanner's mail truck. Walker followed in Hanley's pickup truck.

It was apparent to the investigating officers that Tanner had been interrupted as he performed his normal job duties. His keys were left dangling in the back door of the post office where he had activated the hydraulic lift. The rolling mail container, still loaded, was outside the partially open door, partway on the lift. When accosted, Tanner had been standing on the lift, above ground level, preparing to load the mail.

Blood and tissue were left in the dock area, on the ramp, and on and around the hydraulic lift. The wadding from a shotgun shell was also left on the ramp.

5

The mail truck, driven by Hanley, and Hanley's pickup, driven by Walker, caravaned from the post office to the Bucksnort Exit off Interstate 40. Hanley led Walker up a dirt road leading to the old rock quarry. The mail truck was pulled beneath the interstate bridge, with Timothy Tanner's body in the back.

After parking the mail truck, Hanley quickly removed some mailbags and transferred them and his shotgun to his pickup. Hanley drove the pickup to a wooded area where he and Walker hurriedly covered the mailbags with leaves in an effort to make the killing look like the by-product of a mail robbery. Back on the road, Hanley instructed Walker on how to dismantle the shotgun, which was then discarded piecemeal. Hanley subsequently altered the tires on his pickup and cleaned his truck with pressure hoses.

Hanley dropped his younger half-brother off at a friend's house around 7:00 p.m. that evening. Within minutes, Walker had told his friend what Hanley had done. Meanwhile, around 7:30 p.m. the same day, the abandoned mail truck was noticed, but not reported.

It was just after 2:00 a.m. on June 5 when Tanner and the mail truck were reported as missing to the local sheriff. Later on the morning of June 5, an employee of a gas station - market off the Bucksnort Exit sent a customer to check out the mail truck, which had been observed under the interstate bridge all night long. Timothy Tanner's body was found in the back of his mail truck, and law enforcement, already searching for the missing man, was summoned.

The subsequent autopsy revealed that Tanner died from a shotgun blast to his chest and neck. The pellets travelled

6

diagonally through his body, back to front and right to left.  The path of the pellets was also from down to up.  Tanner was shot in the back as he stood elevated on the lift preparing to load the mail.

White pellets of polypropylene, a substance used in pellet form as buffer material in shotgun shells, was found three places: with Tanner's shirt; in the front passenger compartment of the mail truck; and inside the passenger compartment of Hanley's pickup truck.  A bloodstain resembling blood spatter was found on the back window of Hanley's pickup.  That blood was Type A, which matched that of Tanner.

In the appellant's first issue challenging his convictions, he contends that the trial judge erred in not suppressing the evidence obtained in the search of his pick up truck on the ground that the affidavit utilized to obtain the search warrant did not establish probable cause.

Appellant urges at this level that the search warrant should be evaluated under applicable state law and that, when so evaluated, it is found to be deficient.

We hold that federal law controls the assessment of the adequacy of the affidavit utilized in obtaining the search warrant.  We further find that the affidavit was sufficient to establish probable casue.

It should be noted that although the appellant frames this issue in terms of error on the part of the trial judge, the question of whether federal or state law controls, which is determined by the respective roles and activities of the law enforcement officers, was never raised at the hearing on the

7

motion to suppress.  The issue raised at that hearing was a very general attack on the sufficiency of the affidavit underlying the search warrant.  Even if error had occurred, it should not be inferred that the issue raised on appeal was presented to the trial judge and that he made an erroneous decision.

The search warrant in question was obtained by postal inspectors employed by the United States government.  It was issued by Federal District Judge L. Clure Morton.

The appellant contends that those federal postal inspectors were mere agents of the State law enforcement officers involved in the homicide and theft investigation and that state law, with its stricter standard for establishing probable cause, applies.  The facts do not support appellant's contention.

As is apparent from the relatively detailed factual summary contained hereinbefore, the appellant's criminal conduct violated the laws of two sovereigns, the federal government and the state government.  The evidence reveals that the appellant's intention was to eliminate a romantic rival.  The theft of the mail truck and its contents were incidental to the homicide, and their disposition was to delay the detection of the murder and to disguise the true motive and identity of the killer.

Under this set of facts, the federal and state offenses and attendant investigations were obviously interrelated.  However, even though the persons, activities, and physical evidence being investigated were the same and the state and federal investigations were therefore largely parallel, they were still independent investigations conducted on behalf of distinct governments involving violations of different bodies of law.

8

Moreover, the mere fact that officers of the federal government obtained the physical evidence and delivered it to the state laboratory for analysis, instead of having time-consuming and expensive duplicative scientific procedures performed at a federal laboratory does not mean that the federal investigation was subsumed into the state investigation and does not transform the postal inspectors into mere agents for the state law enforcement officials.  Agents of the two governmental entities can work side-by-side and even share resources without forfeiting independent control and accountability. See, Dillon v. State, 844 S.W. 2d 139 (Tenn. 1992); State v. Hudson, 849 S.W. 2d 309 (Tenn. 1993); State v. Cauley, 863 S.W. 2d 411 (Tenn. 1993).

The sufficiency of the search warrant is therefore to be determined by the federal standard, which is the totality of the circumstances test for probable cause.  Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L. Ed. 2d 527 (1983).  In Gates, the duties of the issuing and the reviewing courts are explained:

> The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.  And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed. 462 U.S. at 238, 239, 103 S.Ct. at 2332

The subject affidavit is detailed and in proper form. It contains a thorough chronological account of events and allegations, and an explanation of the corroboration of many of those points.  The sources are sufficiently defined.  In summary, it contains ample appropriate information to allow the issuing judge to make the necessary neutral and detached determinations as

9

to credibility and reliability. Probable cause is well established.

Appellant's challenge to the sufficiency of the affidavit is therefore meritless.

The appellant next complains that it was error for the trial court to allow three witnesses for the State to recount prior consistent statement evidence. Over the appellant's objection, the State was allowed to introduce, through Michael Lovell, Deborah Annette Walker and Ramsey Mosley, evidence that John David Walker made statements to them which were substantially consistent with his testimony at trial.

At the time the corroborative proof was admitted, Walker had already completed his trial testimony. In his cross-examination of Walker, appellant's skilled attorney vigorously challenged the truthfulness of Walker's testimony on direct. The inconsistencies between Walker's testimony before the federal grand jury and at trial were emphasized. One of defense counsel's tactics was to infer that Walker's account of the murder was fabricated to minimize his culpability and to allow him to bargain with both the state and federal authorities for leniency in exchange for his testimony against Hanley.

It is true that it is generally not permissible to corroborate any witness with proof of consistent statements. However, there are exceptions to this general rule. One of those is where, as here, it is contended that the witness' testimony derives from recent influence or is based upon faulty recollection. In such an instance, it is permissible to demonstrate that before the influence was brought to bear, or at a time when the matter was fresher in the witness' memory, the

witness had made statements consistent with the ultimate testimony. State v. Meeks, 867 S.W. 2d 361, 374 (Tenn. Crim. App. 1993); State v. Benton, 759 S.W. 2d 427, 433, 434 (Tenn. Crim. App. 1988).

In this case, Walker had made the challenged statements before he was charged. Indeed, it was apparently the fact that two of the three people he told in turn reported his account of the killing to the sheriff which led to Walker being charged. While it has long been acknowledged that it is sometimes difficult to judge when a witness' motive to misrepresent the facts arose, it is clear that at the time Walker made the statements that were consistent with his subsequent trial testimony, he had no direct or immediate pressure to lie. See, Legere v. State, 111 Tenn. 368, 374, 77 S.W. 1059 (1903).

Under the circumstances, we find that the trial judge did not err in allowing Walker's prior consistent statements to be admitted into evidence.

In conjunction with this issue, the appellant contends that Sutton v. State, 291 S.W. 1069, 1070 (Tenn. 1927) and State v. Jones, 385 S.W. 2d 80, 85 (Tenn. 1964) stand for the proposition that the exception to the rule against admissibility of prior consistent statements cannot be invoked if the party whose witness' credibility requires shoring up has itself challenged the witness' credibility. This argument is based on the language that "the exception is applied when the attack upon the testimony of the witness has been made in the form of cross-examination only." (emphasis added). Appellant's construction of the holding is erroneous. The relied-upon language means that there need be no impeachment of the witness above and beyond cross-examination to trigger application of the exception.

11

In his final issue, the appellant complains that the trial judge should have granted his motion for mistrial based on what appellant characterizes as the judge's erroneous comment on the evidence.

As mentioned in conjunction with the preceding issue, after Michael Lovell testified as to a prior consistent statement made to him by John David Walker, and before Deborah Annette Walker offered similar testimony, the trial court gave the jury a limiting instruction regarding their consideration of that evidence. Specifically, the trial judge instructed:

> Ladies and gentlemen, I'm going to give you a brief lesson in the law of evidence, particularly hearsay evidence, and I have reference to the testimony that you heard recently by Michael Lovell as to the statement that John David Walker made to him about where he had been and who had done what with reference to a killing. Much of what he told his friend, that is, it was a statement made out of court not under oath, not subject to cross examination, by the witness who says, "Somebody told me something." So you can consider that part of Mr. Lovell's testimony, if you believe his testimony, only to the extent that it reinforces the credibility of John David Walker, who the proof showed had made prior inconsistent statements, that is inconsistent with his testimony here today. Under the law of evidence, the state in this case, where their witness has been impeached in that way, can bring in prior consistent statements.
>
> But it's for that limited purpose, testing the credibility of John David Walker, particularly, and not for establishing what actually happened at the scene of the killing.
>
> The same thing, basically, will apply to this witness' testimony which you're about to hear, it's another statement by this witness that tends to be consistent with John David Walker's testimony at trial.

Defense counsel interrupted with an objection and the trial judge readily acknowledged that he had already realized he had

12

misspoken by characterizing Mrs. Walker's anticipated testimony as corroboration of Mr. Walker's. The trial judge immediately gave the following remedial instruction to the jury:

> Ladies and gentlemen, as in every case, you'll be instructed that the jury is the sole and exclusive judge of the credibility of the witnesses and the weight to be given to the testimony of the various witnesses, and a judge, in the first place, has no opinion, is not entitled to have any opinion, and he's forbidden to comment on the evidence, and that means expressing to the jury anything that might indicate that the judge may think a witness is truthful or untruthful of may think that their testimony has weight or doesn't have weight. And I hope I haven't said anything that indicated that to you.
>
> I was more careful in dealing with Michael Lovell's testimony when I said only if you believe his testimony does it tend to show a prior consistent statement. But that's for you to determine in his case, and also in this lady's case. If you believe her testimony, then it will have whatever weight you think it has as constituting a prior consistent statement.

We believe the trial judge properly handled the situation. In conducting any jury trial, but especially a lengthy homicide trial, a trial judge is constantly faced with unanticipated issues demanding immediate answers and action on the part of the judge. It is absolutely inevitable that mistakes will be made, particularly where circumstances compel the trial judge to extemporaneously explain a complicated rule of evidence to the jury.

The important thing in our analysis of whether the appellant received a fair trial is whether the mistake was recognized and corrected by the trial court. In this case, the immediate curative instruction, which the jury is presumed to have followed, was adequate to counter any previous misstatement on the part of the trial court. See, Monts v. State, 214 Tenn. 171, 379 S.W. 2nd

13

34, 42 (1964).  See also, generally, Francis v. State, 498 S.W. 2d 107, 113, 114 (Tenn. Crim. App. 1973); State v. Hall, 667 S.W. 2d 507, 509 (Tenn. Crim. App. 1983).  Thus, no error occurred.

For the foregoing reasons, we conclude that the appellant's challenges to his convictions are without merit.  Those convictions are affirmed.

_____
WILLIAM S. RUSSELL, SPECIAL JUDGE


CONCUR:


_____
DAVID GREENE HAYES, JUDGE




_____
JERRY LYNN SMITH, JUDGE




IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE


14

BRYAN R. HANLEY,                    )
      Petitioner/Appellant     )     HICKMAN COUNTY
                                        )
                                        )     C.C.A. NO:
v.                                  )     01C01-9508-CC-00266
                                        )
                                        )     HENRY DENMARK BELL
STATE OF TENNESSEE,                 )     JUDGE
      Appellee                   )
_____)


<u>JUDGMENT</u>


     This cause came on to be regularly heard and was taken under advisement.

     After a full consideration of all of the issues the Court is of the opinion that the judgment against the defendant is without reversible error, and said judgment is affirmed.

     Costs on appeal are assessed to the appellant.


                          Hayes, J.
                          Smith, J.
                          Russell, Sp. J.

<u>15</u>