**Alfred FRANCIS, Plaintiff in Error,**

v.

**STATE of Tennessee, Defendant in Error.**

Court of Criminal Appeals of Tennessee.

April 6, 1973.

Certiorari Denied by Supreme Court
July 16, 1973.

Fillauer, Dietrich & Mobbs, Cleveland, for plaintiff in error.

David M. Pack, Atty. Gen., Bart Durham, Asst. Atty. Gen., Nashville, Earle G.

Murphy, Dist. Atty. Gen., Cleveland, for defendant in error.

## OPINION

OLIVER, Judge.

Represented by retained counsel below and here, Francis has duly perfected an appeal in the nature of a writ of error to this Court challenging the validity of his second degree murder conviction and 10-to-15-year penitentiary sentence adjudged by the Criminal Court of Bradley County where he was tried upon an indictment charging him with the first degree murder of Kenneth L. Wright.

 By his first two Assignments of Error here the defendant (a Negro) reasserts the contention made in his motion for a new trial that the trial court erred in overruling his motion to quash the indictment. That motion attacked the indictment on the basis that Negroes were systematically excluded from jury service in Bradley County and from the Grand Jury which returned the indictment against him. An insurmountable barrier stands in the defendant's way. It will be noted that in this motion to quash the defendant does not urge any defect appearing on the face of the indictment, and there is none. The settled law of this State is that a motion to quash an indictment lies only where it is defective or invalid upon its face. State v. Smith, 1 Tenn.Cr.App. 163, 432 S.W.2d 501; Yearwood v. State, 2 Tenn.Cr.App. 552, 455 S.W.2d 612.

In Raine v. State, 143 Tenn. 168, 186, 226 S.W. 189, 195, the Court succinctly stated the rule of law applicable to motions to quash an indictment or presentment:

"Of course, on a motion to quash an indictment, the infirmity relied on must appear on the face of the indictment, and extraneous evidence cannot be resorted to for the purpose of establishing such infirmity."

In State v. Davis, 204 Tenn. 553, 322 S.W.2d 232, the Court said:

". . . A motion to quash an indictment goes solely to the proposition as to whether the indictment is regular upon its face.

* * * * * *

"Motion to quash an indictment will not be sustained unless it is defective or invalid upon its face. Wireman v. State, 146 Tenn. 676, 244 S.W. 488; Price v. State, 199 Tenn. 345, 287 S.W.2d 14."

The Court reiterated this rule in Smith v. State, 207 Tenn. 219, 338 S.W.2d 610:

"This assignment must be overruled for at least one reason and that is a motion to quash will not lie, unless the indictment is defective on its face. State v. Davis, 204 Tenn. 553, 322 S.W.2d 232."

 This Court has no alternative but to follow the law so plainly enunciated and so long established. Thus, although the trial court permitted introduction of evidence pro and con upon the matter raised by the motion to quash, plainly "extraneous evidence cannot be resorted to for the purpose of establishing such infirmity." Raine v. State, supra.

 The fact that the trial judge permitted introduction of such evidence did not and could not convert the motion to quash into a plea in abatement, and could not and did not alter the salutary and firmly established rule that an indictment infirmity such as Francis alleged cannot be reached by a motion to quash.

But beyond all of that, we have nevertheless carefully scrutinized the evidence permitted and heard by the trial judge and we agree with him that the defendant wholly failed to establish that members of his race were systematically excluded from jury service in Bradley County and from the indicting Grand Jury.

 The next Assignment is that the trial court erred in overruling the defend-

ant's motion for a change of venue. Kenneth L. Wright was a Bradley County Deputy Sheriff. The defendant killed him on August 22, 1971. The motion for a change of venue states that after the defendant was placed in the Bradley County Jail the same day, Deputy Sheriff Lee Moore went to his cell and shot him several times; that on March 9, 1972 Moore was convicted of assault with intent to commit voluntary manslaughter and was sentenced to pay a fine of $100 and to imprisonment for 11 months and 29 days in the county workhouse; that the defendant testified as a prosecution witness in Moore's trial and was interrogated on cross-examination with reference to prior convictions which would be inadmissible in his own trial scheduled for March 20, 1972 and that some of the prospective jurors called for his trial were present at Moore's trial when he testified; and that this latter circumstance together with prejudicial press and radio publicity made it improbable that he could receive a fair and impartial trial in Bradley County. Various Xerox copies of newspaper articles were attached to the motion.

The trial court's order overruling the motion for a change of venue recites:

"Upon hearing the defendant in his motion for change of venue and upon considering the newspaper clippings filed in this cause, it appears to the Court that the defendant has not shown that there is any undue excitement or that any other situation exists that would prevent the defendant from receiving a fair trial, that the defendant is under a $25,000.00 bond and comes and goes as he pleases and has not been abused by anyone."

■ Although it thus appears that a hearing was conducted on this motion and that the court heard the defendant, there is no transcript of that hearing in this record. Nor are the copies of newspaper articles included in the Bill of Exceptions and cannot be considered on appeal. Driscoll v. State, 191 Tenn. 186, 232 S.W.2d 28;

Baldwin v. State, 204 Tenn. 639, 325 S.W. 2d 244; Chico v. State, 217 Tenn. 19, 394 S.W.2d 648. The evidence upon which the trial court based his action is presumed to have been sufficient in the absence of a Bill of Exceptions. Clark v. State, 214 Tenn. 555, 381 S.W.2d 898. In the absence of such a record this court cannot say that the trial judge acted arbitrarily and abused his discretion to the prejudice of the defendant by overruling the motion for a change of venue. That is the test. Absent a clear showing of such abuse, this Court cannot reverse the action of the trial judge. Wheeler v. State, 220 Tenn. 155, 415 S.W.2d 121; Swain v. State, 219 Tenn. 145, 407 S.W.2d 452; Wilson v. State, 2 Tenn.Cr.App. 138, 452 S.W.2d 355; TCA § 40–2201.

■ Moreover, the fact that the jury found him guilty of the lesser offense of second degree murder and did not even give him the maximum sentence for that offense (TCA § 39–2408) effectively refutes any contention that the jury was prejudiced against him.

In order to put the defendant's fourth Assignment, as well as his final one, in proper perspective, we summarize the salient facts obviously accredited by the jury. About mid-morning of Sunday, August 22, 1971, Policeman John McLain was on regular patrol alone in Cleveland, Tennessee only a short distance from the corporate boundary line. When he observed the defendant approaching from the rear at an estimated speed between 50 and 60 miles per hour in a 30-mile zone, he started to pull off the street into a grocery store parking lot. Being close upon the patrol car and without waiting for it to clear the street, the defendant cut around it and resumed his excessive speed. Although Officer McLain pursued him for this traffic violation, the defendant disregarded the blue flashing lights on the police cruiser and continued at 70 to 80 miles per hour until he reached and entered his driveway located about a mile and a half beyond the

city limits. McLain never lost sight of the defendant and stopped short of the driveway and got out. The defendant got out of his car. His breath smelled of alcohol. When McLain asked to see his driver's license, the defendant refused, and, when asked why he was driving so fast, told the officer it was none of his business. McLain returned to his patrol car and radioed for assistance "from the county," (obviously meaning the county sheriff's office) and the defendant got in his car and drove it to his house at the end of the driveway. McLain then placed the patrol car across the driveway entrance. The defendant then came back up the driveway in his car, stopped and got out. His attiude of belligerence had changed to ostensible friendliness, and he offered the officer $50 "if you will let me go," to which McLain replied that he couldn't do that and "I try to make an honest living." Still appearing friendly, the defendant said he was a truck driver and did not have a driver's license and that was the reason "I didn't give them to you was because I don't have one," and again asked the officer to let him go. McLain noticed that the defendant's shirt resembled a police uniform shirt, and since he was talking in a friendly manner "I asked him where he got the shirt, just trying to break the ice and conversation and maybe see a way out of it to let the man go on home and forget the whole incident," and the defendant took exception to that question and replied, "It is none of your business where I got this shirt. What's it to you?" Then McLain asked him if he would agree to stay at home the remainder of the day and not get out on the streets anymore because he was drinking too much to be driving, and told him "If he would stay there and not drive anymore that day that we would just forget the whole incident." The defendant agreed and said that would be fine with him. Thereupon, with the defendant standing beside him, McLain again called "the county" and advised that he did not need assistance.

When McLain completed his radio call and started to leave, the defendant suddenly said, "Get out of the car. I'm going to kill you. I am going to beat you to death right here." When McLain opened the door and started to get out of the patrol car, the defendant took two or three steps backward and reached toward his right hip pocket area with his right hand. McLain then pulled his revolver and ordered the defendant to put his hands on the top of his own car and again got on the police radio and asked for assistance. The deceased, who was in the immediate area, arrived within minutes. When McLain glanced momentarily toward the deceased to see who had been sent to assist him, the defendant started running down his driveway. Holstering his revolver, McLain overtook him and seized his left arm. The defendant spun around and struck McLain in the face with his fist, breaking his nose. During the ensuing struggle the deceased intervened and struck the defendant on the head with a blackjack and the defendant knocked or pushed him out of the way. McLain's right arm was enclosed in a cast extending from his elbow to his fingers. He got his left arm around the defendant's neck and was trying to strike him with the cast and the defendant was striking him in the back with his right hand. Suddenly with his right hand the defendant unsnapped McLain's holster and pulled his revolver out and jumped back a few steps and cocked it and aimed it at McLain. The deceased then started to draw his revolver and just as it cleared his holster and before he got it into firing position, the defendant gunned him down with McLain's revolver without saying a word, firing all six shots, five of which were effective.

The defendant testified that he was not driving at an excessive speed in the city either as he approached or after he passed Officer McLain; that he saw the officer following him "but he didn't have no lights or nothing on," and didn't know he was watching him; that after the officer did

turn on his light "There wasn't no place to pull off so I just went on up to my driveway"; that when he got out and Officer McLain asked to see his driver's license, he told him at first that he didn't have one because he was afraid the officer would take it and the only way he had to make a living was as a truck driver; that "we discussed the matter a little bit and I seen I wasn't getting no where and so I walked back to my car and started home"; that he turned around at his house and came back to try to reason with the officer, told him that he had a driver's license but needed it because he was employed as a truck driver and that was the only way he had to make a living; that Officer McLain asked him where he got the uniform he was wearing and he replied that he bought it and that all drivers at his place of employment were required to wear a uniform if they could get one, and remarked that it was about like the officer's, "Trying to carry on a conversation with him, and he asked me about my license again. He said 'Well, I guess I will have to take your driver's license.' I said, 'No, I make my living with my driver's license,' and started away from him"; that the officer was still in the patrol car at that time, and told him he would have to take his license; that he did not say anything to the officer when he said that but just turned away and started to leave in a trot; that "I just started backing up, turned around, and he walked up behind me and told me to get my hands up. I put up on the car"; that he heard a car come up behind, looked "down under my arm kind of" and saw it, and then seeing that Officer McLain was not looking at him, he then took a step or two intending to go home because he was scared; that Officer McLain then grabbed him by his left side and pulled him around and he struck the officer and they began scuffling and McLain had his hands around his neck and back and was hitting him when the deceased came up and struck him on the head with some black object about three times; that "I got kind of dizzy and I figured I had to do something so me and him were

scuffling and I got his gun someway and I told them both to back off of me," but didn't aim it directly at either one of them and didn't cock it and had no intention of shooting either of the men; that the deceased started to pull his gun, "I told him to halt and he kept on and I just shot him," firing rapidly as the deceased's gun cleared his holster; that as the deceased started to pull his gun he was coming across the driveway, "He was walking up on me" and "I figured he was going to kill me"; that he is larger than Officer McLain and was not thrown off balance when the officer grabbed him by the arm and spun him around; that after the deceased struck him he pushed him away but he came back again; that he had had four beers during the preceding evening and that morning, all in his car; that he did not remember telling the District Attorney General's criminal investigator that Officer McLain grabbed his gun hand and the gun fired in the struggle; and that he did not tell Officer McLain to get out of the car and that he was going to kill him, and did not offer him $50.

■ The statement by the trial judge complained of in the defendant's fourth Assignment of Error occurred during the cross-examination of Officer McLain by defense counsel. In its full context, the statement was as follows:

"Q Mr. McLain, let me ask you this, have you ever arrested anybody for reckless driving and testified at city court that you observed a person driving recklessly in your rear view mirror and followed him a mile and a half out in the county and made the arrest?

GENERAL MURPHY: Your Honor, that wouldn't be material if—

THE COURT: I sustain the objection. It wouldn't be material. It wouldn't be a proper question, Mr. Mobbs. I will charge the jury on the law. The Court is of the opinion that he can do that, that that is a legal arrest, but I am going to charge the jury on that. I have the

charge prepared on that very subject. The law will be given to the jury."

Shortly thereafter apart from the jury defense counsel made a motion for a mistrial because of the foregoing statement by the court. In overruling that motion the court said:

"THE COURT: My opinion was, and it still is, Mr. Mobbs, and as I stated to the jury, my opinion is that an officer does have the right to leave the city jurisdiction and I am still of that opinion and I will so instruct the jury, under certain circumstances, and the jury has the right to determine whether or not these circumstances were present or not. But it is the Court's opinion that under certain circumstances a city officer has the right to leave the jurisdiction of the city, and I will so instruct the jury."

When the jury returned and the trial was resumed, the court made this statement:

"THE COURT: Now, Ladies and Gentlemen of the Jury, the defense moves, objects to a statement I made to the jury, and I am not sure how you took it. Apparently they, the defense misunderstood what I said and maybe you did too concerning the arrest of a person outside the city limits. The Court said or intended to say that in the Court's opinion a city officer may make a legal arrest outside the city limits and that I would instruct the jury as to the law surrounding that which I will do. I am not saying or attempting to say that this arrest was lawful or unlawful. I will instruct the jury at the proper time and the jury will have to decide that."

In his formal charge, the court instructed the jury, in pertinent part, as follows:

"Because of the facts and circumstances appearing in this case, the Court will explain to you the law relative to an arrest.

"According to our code, an officer may, without a warrant, arrest a person: first, for a public offense committed or a breach of the peace threatened in his presence; . . .

"This is the law as found in Code Section 40–803 and means that at times an officer may make an arrest without a warrant. He may make an arrest at any time for an offense committed in his presence either a felony or a misdemeanor. In order to arrest for a misdemeanor, it must have been committed in the presence of the officer. If not in his presence, the officer would have to have a warrant.

\* \* \* \* \* \*

"As I have explained to you an officer or a private person has a right and even a duty to make an arrest for a public offense or misdemeanor committed in his presence. Even though an officer or private person does not have the right to pursue a person who has committed a misdemeanor, he does have a right to perfect the arrest by using whatever force is reasonably necessary. In perfecting the arrest the officer has a right to follow the defendant in the commission of a continuing offense until he may reasonably make the arrest as long as the defendant is in his view and continues to commit the offense for which he is being followed. And where an arrest is thus attempted, the officer is not limited to his jurisdiction as long as he is in the State of Tennessee because if he is viewing a person who is committing and continues to commit a public offense he has the right as a private citizen to perfect the arrest."

For the defendant it is argued " . . . the defense was based on the theory the Defendant used justifiable force to resist an illegal arrest. The Court invaded the province of the jury and expressed a direct and unequivocal opinion that the arrest was 'lawful' and this discredited the defense."

That argument is untenable. In the first place, the trial judge did not invade the province of the jury. He carefully ex-

plained to them when they returned after the defendant's mistrial motion that he was not saying whether the arrest was lawful or unlawful, and in his charge he properly left the question to the jury.

In a prosecution for homicide occurring while a peace officer or other person, in the regular exercise of his authority or duty, is making an arrest, if the facts are in dispute or such that different conclusions might reasonably be drawn therefrom, it is a question of fact for the jury as to whether the arrest or attempted arrest was lawful or unlawful. 41 C.J.S. Homicide § 343.

Secondly, municipal police officers have statutory authority to pursue one mile beyond the city limits a person observed in the commission of a public offense in the city. (TCA § 6–609). Surely it cannot be said with reason that the authority of city policemen to arrest one committing public offenses in their sight and presence is terminated and they become helpless and barred from arresting such an offender if he succeeds in outrunning them to the city limits, or to the one-mile limit prescribed by TCA § 6–609. Indeed, such a theory would require city police officers seeing a patently drunken driver within the city, in violation of a city ordinance and state law, to abandon pursuit at the one-mile limit and permit him to continue and imperil all persons upon the highway. The arms of municipal law officers are not to be so tied. The one-mile limit prescribed by TCA § 6–609 was never intended to provide sanctuary and freedom from arrest for criminals who can outrun the policemen to that line. It is not the law that city policemen seeing law violations within the city must stop their pursuit at that line and permit the fleeing offender to escape before their eyes.

In Minor v. State, 153 Tex.Cr.R. 242, 247, 219 S.W.2d 467, 469, the Texas Court of Criminal Appeals said:

"Undoubtedly these policemen were within the law when they initiated their effort to take appellant into their custody, and it should be evident that they were in process of a legal arrest in the beginning; and further, that another offense arose and an additional right to take appellant into custody came into being when he attained such a great speed on the streets and highways. Then the attempted arrest having been lawful, shall we say that because of excessive speed the wrongdoer reached a point over the city corporate line that the authority rightfully in being to arrest culminated in the midst of its being exercised? We cannot think so. When the right existed and was being exercised, the fact that such arrest was not culminated within the confines of the city should not keep the same from being a lawful detention . . . .

"What we are holding herein is that where a police officer has the right to arrest without warrant for an offense committed within the confines of his city and initiates a pursuit of the malefactor, being in immediate pursuit, he can continue such pursuit, although such continuance leads him outside the corporate limits of the city, if necessary, his rights being the same as those of the sheriff in such event."

The Minnesota Supreme Court followed the same rule in Smith v. Hubbard, 253 Minn. 215, 223, 91 N.W.2d 756, 764:

"Therefore, since the acts [speeding and careless driving] were all committed in plaintiff's presence and because from them he had reasonable cause to believe that they constituted a misdemeanor, we conclude that he had the right either to arrest defendant in St. Croix Beach [the city] or to pursue him beyond its boundaries for that purpose and to use whatever force was necessary in so doing."

And in Morris v. Combs' Administrator, 304 Ky. 187, 200 S.W.2d 281, the Court held:

"There is nothing in the record to show that Morris was not acting in good faith. He had the right to make an arrest, without a warrant, of a person guilty of drunkenness or disorderly conduct in his presence, or whom he had reasonable grounds to believe guilty of such conduct. (citations omitted). There is testimony supporting his own to the effect that he thought Watts was drunk. Morris had the right to pursue Watts beyond the city limits of Hazard in an effort to make his arrest."

 Moreover, even if it be argued that Officer McLain's status became that of a private individual when he crossed the city boundary or the one-mile limit, his pursuit of the fleeing defendant for the purpose of arresting him was still lawful. TCA § 40–816 authorizes arrest by a private person for a public offense committed in his presence. "When acting without a warrant outside his bailiwick, unless aided by some special authority of law, an officer has only the authority which a private person may have in apprehending criminals. Needless to say, in the absence of some unusual restriction he would not have less power than this. If an officer sees a public offense committed, he may arrest the offender outside his bailiwick, because any private person could do as much. This would be true whether the officer merely happened to be outside his bailiwick at the moment, or passed the boundary line in fresh pursuit of the fleeing offender (assuming that he does not go outside of the state)." Perkins, The Tennessee Law of Arrest, 2 Vanderbilt Law Review, 509, 584–585.

In People v. Alvarado, 208 Cal.App.2d 629, 25 Cal.Rptr. 437, cert. den. 374 U.S. 840, 83 S.Ct. 1891, 10 L.Ed.2d 1060, the Court said; "An arrest by a city policeman outside his territorial jurisdiction is unquestionably valid if made upon grounds which would authorize a lawful arrest by a private citizen."

And the Court in People v. Alston, 49 Misc.2d 891, 268 N.Y.S.2d 892, affirmed 28 A.D.2d 823, 282 N.Y.S.2d 669, made this statement of the same principle: "Suppose, however, that the circumstances are such as to justify a valid arrest by a private person. Certainly the private person's right to arrest is not limited by the boundaries of any subdivision of the state but must be considered to be state-wide. It would seem anomalous if a private person could make a valid arrest under such circumstances but a peace officer or police officer could not."

 But beyond that, Policeman McLain testified, and the jury obviously believed him, that he did not place the defendant under arrest and did not draw his gun to prevent him from escaping or to arrest him until the defendant told him to get out of the patrol car and that he was going to kill him. He had not arrested the defendant prior to that time, and they had agreed upon a settlement of the incident and Officer McLain was preparing to leave. Thus, when he drew his gun on the defendant and restrained him by requiring him to place his hands on the top of his car, the officer had a perfect right to do so because of the threatened breach of the peace by the defendant in his presence, TCA § 40–803(1), and to prevent the threatened felonious assault upon him. An officer may arrest a person without a warrant where any public offense or breach of the peace is threatened or committed in his presence. Alley v. State, 218 Tenn. 497, 404 S.W.2d 493. Thus, unquestionably the only attempt by Officer McLain to arrest the defendant was perfectly lawful. And TCA § 38–208 provides: "It is the duty of all peace officers who know or have reason to suspect any person of being armed with the intention of committing a riot or affray, or of assaulting, wounding, or killing another person, or of otherwise breaking the peace, to arrest such person forth-

with, and take him before some justice of the peace." It cannot be doubted that the deceased was authorized and duty-bound to assist and help arrest the defendant who was resisting and committing assault and battery upon McLain.

But even if it could be said that in thus placing him under restraint Officer McLain was illegally attempting to arrest Francis at that time, or that the deceased deputy sheriff illegally attempted to do so, that did not authorize him to employ force or means of resistance disproportionate to the effort made to take him into custody. Shelton v. State, 3 Tenn.Cr. App. 310, 460 S.W.2d 869, and authorities there cited. The question as to whether excessive force was used by an officer making an unlawful arrest, or by the person sought to be arrested, is for the jury to decide under all the circumstances. Shelton v. State, supra. The jury has resolved that issue by accepting Officer McLain's testimony and rejecting the defendant's.

By his final Assignment of Error the defendant presses the contention that the trial court erred in overruling his motion for a directed verdict on the issue of second degree murder, his specific thesis being that there was no evidence to establish he acted with malice aforethought and that the evidence thus preponderated against the verdict of second degree murder. In Bailey v. State, Tenn.Cr.App., 479 S.W.2d 829, we summarized the law of this State with reference to the element of malice in homicide cases:

"Every homicide is presumed to be malicious in the absence of circumstances ·rebutting this implied presumption. Harper v. State, 206 Tenn. 509, 334 S.W.2d 933; Gann v. State, 214 Tenn. 711, 383 S.W.2d 32.

"Killing with a deadly weapon raises a presumption of malice sufficient to justify a finding of murder in the second degree, in the absence of facts or circumstances rebutting that presumption. Nance v. State, 210 Tenn. 328, 358 S.W. 2d 327; Gann v. State, supra; Bostick v. State, 210 Tenn. 620, 360 S.W.2d 472; Smith v. State, 212 Tenn. 510, 370 S.W.2d 543.

"In such cases the burden is upon the State to establish that the killing constituted murder in the first degree, if such is charged, and the defendant has the burden of showing mitigating facts and circumstances sufficient to reduce the degree of the homicide below second degree murder. So it is that malice is an essential ingredient of murder in the second degree. Harper v. State, supra; Smith v. State, supra. If one person, upon a sudden impulse of passion, without adequate provocation, and disconnected with any previously formed design to kill, kills another willfully and maliciously, such killing is unlawful and is murder in the second degree. Malice is not necessarily confined to an intention to take the life of the deceased, but includes an intention to do any unlawful act which may probably result in depriving the party of life. It is not so much spite or malevolence to the individual in particular as an evil design in general, the dictates of a wicked and depraved and malignant heart. It may be either express or implied in law. Warren v. State, 44 Tenn. 130. See also: 1 Wharton's Criminal Law & Procedure (Anderson), § 63.

"Of course it is fundamental that the jurors are the sole and only judges of the evidence, and of the weight to be given to the swearing of each and every witness in the case. The credibility of the witnesses, the weight and value of their testimony, the inferences to be drawn from their statements, and all factual issues raised by the testimony and evidence introduced—direct and circumstantial, are matters entrusted exclusively to the jury as the triers of the facts. Humphrey v. State, 187 Tenn. 377, 215 S.W.2d 791; Cole v. State, 187 Tenn.

459, 215 S.W.2d 824; Steele v. State, 189 Tenn. 424, 225 S.W.2d 260; Smith v. State, 205 Tenn. 502, 327 S.W.2d 308; Hardin v. State, 210 Tenn. 116, 355 S. W.2d 105. Thus, the jury has the duty and prerogative in homicide cases of determining the question of malice and whether or not the defendant proved facts or circumstances sufficient to rebut the presumption of malice arising from the fact of the killing. Gray v. State, 63 Tenn. 331."

See also: Fox v. State, 1 Tenn.Cr.App. 308, 441 S.W.2d 491; Gordon v. State, Tenn.Cr.App., 478 S.W.2d 911; Bunch v. State, 3 Tenn.Cr.App. 481, 463 S.W.2d 956; Clarke v. State, 218 Tenn. 259, 402 S.W.2d 863.

By its verdict the jury has properly found that the arrest of the defendant which he was resisting at the time he shot the deceased was a lawful arrest. More than a hundred years ago the Supreme Court of this State held that to kill an officer in making a lawful arrest is murder. The Court said in Galvin v. State, 46 Tenn. 283:

"But the law does not allow that a lawful arrest is a provocation to passion and heat of blood. And, if the officer had the right, under the circumstances proven, to make the arrest, and was engaged, using no more force than was reasonably necessary, in accomplishing it, then the killing of him by the defendant would be murder; and the fact that the killing was in the heat of blood caused by a lawful arrest, would not reduce the offence to the grade of manslaughter."

The defendant fired at the deceased six times in rapid succession and with deadly accuracy. Five of the shots were effective, one bullet striking the deceased in the face and piercing his brain. In our opinion, upon consideration of all the facts and circumstances in this record the jury was well warranted in finding the defendant guilty of second degree murder. He has failed to carry his burden of demonstrating here that the evidence preponderates against that verdict. Jamison v. State, 220 Tenn. 280, 416 S.W.2d 768; Webster v. State, 1 Tenn.Cr.App. 1, 425 S.W.2d 799; Hancock v. State, 1 Tenn.Cr.App. 116, 430 S.W.2d 892; Morelock v. State, 3 Tenn.Cr. App. 292, 460 S.W.2d 861; Chadwick v. State, 1 Tenn.Cr.App. 72, 429 S.W.2d 135; Phillips v. State, 2 Tenn.Cr.App. 609, 455 S.W.2d 637.

Let the judgment of the trial court be affirmed.

MITCHELL, J., concurs.

GALBREATH, Judge (dissenting).

A number of factors prompt me to take issue with the verdict of the jury and its approval by the trial court and the majority here.

Stripped down to its rudiments we have before us from the State's proof, which we must accredit as being true, a fight between a man seeking to retreat into the safety of his home and two armed officers who under provocation sought to use undue force in making an arrest. Under such circumstances a resulting death is voluntary manslaughter.

Assuming that the defendant was arrested for a threatened breach of the peace in the presence of Officer McLain, then outside his bailiwick and limited in his authority to that of a private citizen, he was clearly outside that authority when he employed a deadly weapon to make that arrest. The law is well settled in Tennessee that an officer may not resort to such force as will shed blood, much less threaten life, in arresting or preventing the escape of one charged with an offense less than a felony. See Reneau v. State, 70 Tenn. 720; Human v. Goodman, 159 Tenn. 241, 18 S.W.2d 381; Johnson v. State, 173 Tenn. 134, 114 S.W.2d 819.

Not only was Officer McLain not justified in unholstering his pistol to effect the

arrest, Officer Wright was equally unjustified in employing the deadly and dangerous weapon he did in attempting to subdue the defendant by striking him repeatedly with his blackjack. TCA § 39–4901, in listing dangerous weapons, categorizes a blackjack along with a pistol as such. Then too, the plaster of paris cast Officer McLain was striking at the defendant with would undoubtedly have been capable of inflicting serious injuries or death. If the officers had allowed the "escape" of the defendant into his home and had a wrecker tow away his automobile as one suspected of having been driven by a person under the influence, as they had a right to do, the defendant would undoubtedly have promptly made himself available for prosecution, and both his and Officer Wright's bloodshed would have been averted. All concerned overreacted, and as sometimes happens when deadly weapons are used in provocative circumstances, death ensued. These circumstances militate against murder and were, when proved by the State, sufficient to reduce the degree of homicide to voluntary manslaughter.

When the officers exceeded the reasonable force limits available to them under the law and commenced beating the defendant with weapons capable of killing him, what might have been a lawful arrest was changed into unjustified assault. It can hardly be said under the facts of this case that the defendant killed to prevent arrest. He clearly acted out of the heat and provocation engendered by the injuries being rained on him by the officers.

"An officer has no absolute right to kill, either to take, or prevent the escape of, a prisoner. If with diligence and caution the prisoner might otherwise be taken or held, the officer will not be justified for the killing, even though the prisoner may have committed a felony." Love v. Bass, 145 Tenn. 522, 238 S.W. 94.

The Supreme Court of Georgia, in a case where excessive force was used by an arresting officer, while not completely excusing the homicidal act states the law as I believe it to be:

"If a person under lawful arrest for a misdemeanor kills the officer because of an unlawful assault by the officer upon him, even such as to draw blood, but such assault is not so serious as to amount to a felony, or to what would reasonably appear to amount to a felony, then, in either event, the person slaying the officer would be neither guilty of murder, nor guiltless, but the offense would be voluntary manslaughter." Mullis v. State, 196 Ga. 569, 27 S.E.2d 91.

Lastly, I cannot close my eyes to the obvious disparity in the treatment of the offense committed by the defendant under the heat and provocation of the assaults made to prevent his running into his home and that accorded the deputy sheriff who went to the defendant's jail cell and deliberately pumped bullets into his body in a vicious attack that, had death ensued, would have resulted in the indignity of branding Tennessee as the only Southern state in recent years to experience a racial lynch. If the act of that officer in this sad affair was an attempt to commit voluntary manslaughter, surely the act of the defendant was motivated by no greater will to inflict harm.

The facts, as presented to the jury, will not support the conviction for murder, and I would recommend reduction to voluntary manslaughter. For that reason I must respectfully dissent.