# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs at Knoxville September 16, 2014

## STATE OF TENNESSEE v. LESTER ARNOLD CLOUSE

**Appeal from the Criminal Court for White County**
**Nos. CR-00676 & 00686B      Donald P. Harris, Senior Judge**

_____

**No. M2013-02633-CCA-R3-CD - Filed December 23, 2014**

_____

Appellant, Lester Arnold Clouse, was convicted of aggravated assault, a Class C felony; simple assault, a Class A misdemeanor; and resisting arrest, a Class B misdemeanor. After merger of the resisting arrest conviction with the aggravated assault conviction, the trial court sentenced him to fifteen years and eleven months, twenty-nine days, respectively. Appealing from his convictions and sentences, appellant argues that: (1) the trial court improperly denied his motion to suppress; (2) the trial court failed to approve the verdicts as thirteenth juror; (3) the evidence was insufficient to support his assault convictions; and (4) the trial court erred in sentencing him to fifteen years in confinement consecutive to other outstanding sentences. Following our review, we affirm the convictions. However, we reverse appellant's sentences and remand this cause for a new sentencing hearing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Reversed in Part; Remanded**

ROGER A. PAGE, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Billy Keith Tollison III, Sparta, Tennessee, for the appellant, Lester Arnold Clouse.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Randall A. York, District Attorney General; and Howard Chambers, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Procedural History

Appellant was indicted for seventeen counts of arson, two counts of aggravated assault (Deputies David Gibbons and Bill Harris), and resisting arrest. His first trial in 2001 resulted in convictions on five counts of arson, two counts of aggravated assault, and one count of resisting arrest. *State v. Lester Arnold Clouse*, No. M2004-00124-CCA-R3-CD, 2004 WL 193069, at *1 (Tenn. Crim. App. Jan. 30, 2004). This court reversed appellant's convictions and remanded the cause for a new trial on all counts. *Id.*

Following the June 2005 retrial on all of the charges, the jury found appellant not guilty of the arson counts, guilty of aggravated assault (Deputy Bill Harris), guilty of the lesser-included offense of assault (Deputy David Gibbons), and guilty of resisting arrest. The trial court approved the jury's verdicts. The trial court conducted a sentencing hearing on October 11, 2005. At the conclusion of the hearing, the trial court requested the parties to submit supplemental briefs as to the validity of certain prior convictions that appellant contested. The court indicated its desire to issue an order within thirty days. When the original trial judge left the bench, a sentencing order had not been issued.

A successor judge was appointed and signed the judgment orders on February 22, 2008. The court sentenced appellant as a persistent offender to fifteen years in confinement for aggravated assault, to be served consecutively to other outstanding sentences. The court merged appellant's conviction for resisting arrest into his conviction for aggravated assault, and the court imposed a sentence of eleven months, twenty-nine days for his assault conviction, to be served concurrently with the aggravated assault conviction but consecutively to other outstanding sentences.

A second successor judge was appointed to hear the motion for a new trial. The hearing was conducted, and the successor judge issued a written order denying the motion on October 11, 2013. This timely appeal follows.

## II. Facts

### A. Facts from Suppression Hearing

At the beginning of the hearing, appellant conceded that he was a passenger in the vehicle driven by his co-defendant Michael Shane Carter and that he did not have standing to challenge the search of the vehicle. He clarified that his position was that "anything the State intend[ed] to use as a result of the seizure" was inadmissible.

The State presented Deputy David Gibbons with the Putnam County Sheriff's Department as a witness. He testified that on October 26, 1999, he was performing a routine traffic patrol when he was alerted to several fires being set in the area. He responded to an area around Stone Seminary Road and was instructed to be on the lookout ("BOLO") for a small black car with two male occupants who were possibly involved. The area Deputy Gibbons was patrolling ranged from one to five miles from the Putnam/White County line. During the patrol, Deputy Gibbons noticed fires on the right side of the road, and the fires decreased in size as he followed the trail into White County. While following the line of fires, he spoke with a delivery man who told him that a small black car was a short distance in front of him. Deputy Gibbons continued and observed the vehicle about a mile into White County. The vehicle was moving at an "extremely" slow rate of speed; Deputy Gibbons estimated that the rate of speed was approximately five miles per hour. He followed the vehicle and initiated a traffic stop. He asked the driver for his license, but the driver did not have it. Deputy Gibbons asked for the driver's personal information, which he used to run the license information through his computer. During this process, appellant exited the vehicle from the passenger's side and began moving things around in the back seat.

On cross-examination, Deputy Gibbons confirmed that he had jurisdiction to stop a vehicle in White County while in the process of investigating a case. The usual procedure involved notifying the county of an officer's actions, and he believed that the notification had been made in this case. Deputy Gibbons explained that he estimated the vehicle's speed by following it but that he had also been trained in estimating the speed of a vehicle by observing it. He stated that he initiated the traffic stop because of the BOLO and because of the extremely slow rate of speed, which caused him to believe that something might have been wrong.

The trial court ruled that Deputy Gibbons was a credible witness and that he had reasonable suspicion to initiate the traffic stop. It stated that it was "very, very, very clear, . . . almost a textbook classic case." The court summarized that Deputy Gibbons was patrolling near the county line when he received a BOLO about the fires and the small black car that had been seen earlier driving slowly. He then saw larger fires on the right side of the road, becoming smaller as he continued, "which would lead one to believe that we might be on the right trail here." Deputy Gibbons confirmed with the delivery man that the suspect vehicle was ahead of him and continued into White County to further investigate. Deputy Gibbons observed the vehicle about a mile into White County, traveling in the same direction as the fires. Based on the totality of the circumstances, the trial court held that Deputy Gibbons had reasonable suspicion to stop the vehicle.

### B. Facts from Trial

Deputy Gibbons was the State's first witness at trial. His testimony was substantially similar to that at the suppression hearing. At trial, he continued with his recollection of the events of October 26, 1999, by stating that as he was running co-defendant Carter's information, he noticed both occupants exit the vehicle. Around that time, Deputy Bill Harris arrived, and Deputy Gibbons learned that there was a warrant for co-defendant Carter's arrest. Deputy Gibbons requested Deputy Harris to approach the passenger side of the vehicle but advised him that he had previously seen a crossbow in the back seat. Deputy Gibbons then approached the driver's side and placed co-defendant Carter under arrest.

In the meantime, Deputy Linda Dilldine arrived on the scene. Deputy Gibbons then noticed that appellant had exited the vehicle but was leaning into the backseat of the vehicle. He heard Deputy Harris order appellant to move away from the vehicle and place his hands on top of it. Appellant said that he was "checking on some clocks, [and] he didn't want them to get damaged." When appellant stepped away, he was holding the crossbow and then placed it on top of the vehicle. Deputy Gibbons described appellant as "irate." He began screaming at officers, "'I've not done anything wrong.'" Appellant walked around to the front of the vehicle and wielded a pocket knife.

Deputy Gibbons testified that he transferred control of co-defendant Carter, who was then handcuffed, to Deputy Dilldine. He and Deputy Harris approached the front of the vehicle and each stood close to the front tires on opposite sides. Appellant continued "screaming" at officers, "'I've not done anything wrong.'" He continued waving the knife at them. Officers shouted commands at appellant, but he refused to comply. He repeated that he had done nothing wrong and told the officers to "leave [him] alone." Deputy Gibbons confirmed that the knife had been in appellant's right pocket. During the encounter they were four to five feet away from appellant, and Deputy Gibbons felt threatened.

Deputy Gibbons explained that after about a minute had passed, appellant began to flee. He ran down the road, and officers gave chase. They pursued appellant through a field toward the back of it. He continued to threaten them with the knife, and at one time, appellant held it to his own neck and threatened to kill himself. Other officers responded to the scene, and someone sprayed appellant with mace pepper spray then kicked the knife out of his hand. Deputy Gibbons confirmed that the encounter took place in White County. After co-defendant Carter and appellant were arrested, there were no further reports of fires being set in the area.

On cross-examination, Deputy Gibbons acknowledged that he and Deputy Harris had their guns drawn on appellant when he wielded the knife. He clarified that although he

-4-

maintained a short distance between himself and appellant, he was still within the "reactionary gap" of six feet in which he could have potentially been cut by the knife despite his holding a weapon.

The State's next witness was Deputy Bill Harris with the Putnam County Sheriff's Department, who stated that he responded to the area where someone had reported that people in a small black sports car were setting fires. He began his patrol about two or three miles from the Putnam/White County line, and as he followed the fires, he arrived at the location where Deputy Gibbons had stopped co-defendant Carter's vehicle. When he first arrived, Deputy Gibbons was in his patrol car checking warrants and personal information on co-defendant Carter, and Deputy Harris observed that appellant had exited the two-door vehicle and was leaning into the backseat area through the open door. When Deputy Harris approached appellant to ask him to back out of the vehicle, appellant produced a crossbow from the back seat and placed it on the roof of the vehicle. He then attempted to re-enter the vehicle, stating that there was an antique clock that he did not want damaged. While appellant was searching for the clock, Deputy Harris observed arrows for the crossbow and some matches. At that time, Deputy Harris reached toward appellant to grab his arm and pull him away from the arrows. However, before he could do so, appellant pulled away from him and ran to the front of the vehicle.

Deputy Harris recalled that at that time, appellant withdrew a knife from his right pocket and opened it. Deputy Harris drew his weapon and ordered appellant to put down the knife. Appellant began "screaming and yelling not to come any closer, to stay away from him." Deputy Harris said that he "felt threatened, very threatened." He recognized that he was within the "reactionary gap" where he could be cut with the knife before he was able to defend himself. Appellant then began to "back-pedal" down the road while still holding the knife. The chase continued into a nearby field. Somehow, appellant retrieved his cellular telephone and called his mother. He told her, "'[T]hey're trying to kill me.'" Eventually, other law enforcement officers arrived, including a canine handler who brought a "dual purpose attack dog." The canine officer told appellant that if he did not put down the knife, he would release the dog on him. Deputy Harris stated, "The dog was eventually let loose[,] and . . . I don't know that it ever bit him, but it was just enough for us to get on him and get the knife out of his hand."

On cross-examination, Deputy Harris confirmed that there were no fires on the roadside beyond the location where appellant was apprehended. Prior to reaching co-defendant Carter's vehicle, there were fires every ten to twenty yards.

The State called Kimberly Sells as its next witness. On October 26, 1999, she lived on Cunningham Road in White County, which is located approximately one-half mile south

of the county line. Prior to moving to Tennessee, Ms. Sells had been employed as a sheriff's deputy in Indiana and had received training in "flash recognition," among other areas. On that date, around 4:30 p.m., a small black car drove southbound past her house very slowly, and "it was not one known to be in that area." She was standing next to a fence approximately five or six feet from the road, and the passenger leaned out of the window and yelled, "Hey, baby," in her direction. Ms. Sells identified the passenger as appellant.

Shortly after the vehicle passed, Ms. Sells looked northward and "noticed smoke billowing from the ditch." She looked south and observed another small fire located south of her house, also in a ditch. Both fires were on the west side of the road, which would have been the passenger side of the passing vehicle. Between fifteen to thirty seconds later, several law enforcement vehicles sped by.[1]

Appellant then presented Gus Barbutis as his first witness, who was appellant's seventy-eight-year-old neighbor. He recalled seeing appellant on the date in question around 2:00 p.m. when he drove home, but he did not see appellant after that.

Rita Clouse, appellant's mother, also testified and said that she returned home on the date in question around 3:00 or 3:15 p.m. and that appellant was at home when she arrived. He had been repairing a truck. A little while later, co-defendant Carter arrived, and after the two men conversed in the back yard, they left together around 4:00 p.m.

Charlene Austin, appellant's next witness, testified that she visited appellant at his home around 1:00 or 2:00 p.m. on the date in question.

Appellant testified on his own behalf. He explained that on the date in question, his mother had a dentist appointment and that he had to stay at home in case she needed a ride after her procedure. He said that he worked on cars for a living and that he owned a small junkyard. While his mother was away, he worked at home and replaced the glass in a truck between 10:30 a.m. and 1:00 p.m. As he was working, another individual stopped by and asked him to replace the sliding glass window in his vehicle. Appellant stated that around 2:00 p.m., he went across the road to the junkyard, where he removed the glass from another vehicle and saw Mr. Barbutis walking his dog. Appellant returned home and completed the repair around 3:00 or 3:15 p.m. His mother returned home and began to prepare something

---

[1] The State presented five additional witnesses who testified with regard to the extent of the damage caused by the fires and the identification of a vehicle that may have been involved. However, because appellant was found not guilty of all counts of arson, we have omitted a summary of that testimony in this opinion.

to eat. Co-defendant Carter arrived between 4:00 and 4:07 p.m., and they subsequently left together.

Appellant stated that they were going to drive to Livingston so he could sell some antique clocks and other items. He said that they drove to Cookeville via the interstate and exited to get a drink. According to appellant, co-defendant Carter wanted to drive to Sparta because he intended to sell his crossbow to someone there. They traveled various roads and eventually turned onto Post Oak Road from Cunningham Road. The vehicle had proceeded "a short distance" on Cunningham Road when a Putnam County law enforcement officer approached with emergency equipment activated. Appellant testified that he instructed co-defendant Carter to pull over and let the vehicle pass but that the vehicle stopped behind them. Appellant exited the vehicle and Officer Gibbons addressed him, "'[W]hat's going on, Pokey?'" Officer Gibbons asked co-defendant Carter for his driver's license, and when he could not produce it, Officer Gibbons "ran a check" on Carter. Appellant explained that the glass clock had fallen onto the floorboard of the back seat so he retrieved it and wrapped a shirt around it to protect it from damage. He was about to place the clock back in the car when Officer Dilldine walked up and said, "'[L]ook out, he's got a gun in the car.'" Appellant responded that there was no gun in the car, and he picked up the crossbow and placed it on top of the car.

Appellant recalled that someone then mentioned the warrant for co-defendant Carter, so he reached into the vehicle to obtain his belongings because he did not want his valuables to be towed away. When he backed out, officers "had guns pulled" on him. He said that he asked officers what was wrong with them. He stated that he called the man in Livingston whom he was supposed to meet and told him, "'Putnam County Police [have] me pulled over in White County and [have] their guns drawn on [me] . . . call the White County Sheriff's Department and the FBI and let them know what [is] going on . . . .'" He thought they were "going to try to kill" him. Appellant testified that he reached into his pocket and pulled out a knife. He opened it, stuck it toward his throat, and told officers he would kill himself before he would let them kill him. He also said that he informed officers that they lacked jurisdiction in White County. He explained that he was afraid of the officers because they had killed two people previously in Putnam County, including his father. Appellant concluded his direct testimony by disavowing any knowledge of the fires that were set.

On cross-examination, appellant acknowledged that he had pleaded guilty to theft of property valued at more than $1,000 but less than $10,000 in 1999 and that he was on unsupervised probation when these offenses occurred. He denied having shouted anything at Ms. Sells because he "was a married man at the time" they were stopped by officers. He confirmed that the encounter with law enforcement ended when he was sprayed with pepper spray and the knife was kicked from his hand. He added that the attack dog bit him in the

leg in the melee. Appellant denied having threatened officers with his knife. He said that his mother wanted to speak to one of them to ask what was happening but that they would not speak to her. Following this testimony, appellant rested his case.

Upon this evidence, the jury found appellant guilty as charged of aggravated assault of Deputy Bill Harris, guilty of the lesser-included offense of simple assault of Deputy David Gibbons, guilty of resisting arrest, and not guilty of the five counts of arson.

### C. Facts from Sentencing Hearing

At the outset of the hearing, the State argued that appellant should be sentenced as a career offender. Appellant argued against this contention. The State presented Don Fox, a probation and parole officer, who reviewed appellant's prior convictions as contained in the presentence report. Mr. Fox indicated that appellant's criminal history included the following felony convictions that were supported by certified judgments: 1999, theft of property valued at more than $1,000 but less than $10,000, a Class C felony, four-year sentence; 1989, receiving stolen property, a Class C felony, ten-year sentence; 1989, aiding and abetting grand larceny, (no grade given), ten-year sentence; 1987, burglary, a Class C felony, five-year sentence; 1987, grand larceny, a Class C felony, three-year sentence; 1987, two counts of concealing stolen property, Class C felonies, three-year sentences; 1987, possession of property with the serial number altered or removed, a Class D felony, two-year sentence; and 1986, concealing stolen property, a Class C felony, three-year sentence.[2] Mr. Fox also confirmed that appellant was on unsupervised probation when he committed the offenses in the instant case.

On cross-examination, Mr. Fox acknowledged that the judgment form for the 1987 conviction for possession of property with the serial number altered or removed did not list the felony grade and that he assigned the grade himself. He admitted that he could have been mistaken and that it could have been a Class E felony due to the sentence appellant received. He also acknowledged that the 1989 judgment of conviction for receiving stolen property did not bear a felony grade and that he assigned the grade based upon the range of punishment and appellant's being sentenced as a persistent offender for that offense, which would have made the punishment "above the grade."

---

[2] For clarification, the only certified judgment form that lists a felony grade for a conviction is the 1999 judgment form for theft of property. When Mr. Fox testified to the felony grades, he did so based upon his working knowledge of the ranges of punishments for the different felony grades as well as the enhanced punishments imposed by an increase in one's sentencing range. We have included the grades as recited in his testimony and note that for the 1989 conviction for aiding and abetting larceny, Mr. Fox did not testify to a felony grade.

Appellant again testified on his own behalf. He contested several of the offenses listed in the presence report and stated that he had not been charged with many of them. He also offered into evidence an Order Clarifying Prior Judgments and Rescinded Amended Judgments Stated Herein, which he asserted should serve to "cover[] the orders that were previously testified to by the probation officer regarding for [sic] enhancement factors[,] and . . . they all should have been embodied into this one order and . . . that's the only prior order or conviction the court should consider when making a ruling on his sentence."

On cross-examination appellant testified that probation is "just not for [him]" and that he "wouldn't take it." He acknowledged that he had been incarcerated for approximately twenty-one of the past twenty-two years and that when he was not in jail, he worked odd jobs such as "[m]owing yards, cutting trees, killing hogs[,] . . . [and] [f]locking chickens." He disagreed that he was a professional criminal, positing, "How can I be a professional career criminal when I've been convicted and sitting in jail the whole time?"

Without making any findings on the record, the trial court allowed the parties thirty days within which to file supplemental briefs and stated that it would issue an order thereafter. However, the record contains only judgment forms and no order or findings with respect to sentencing. The judgment forms indicate that appellant was sentenced as a persistent offender at forty-five percent release eligibility to fifteen years for aggravated assault and eleven months, twenty-nine days for assault. Appellant now appeals his convictions and sentences.

## III. Analysis

Appealing from his convictions and sentences, appellant argues that: (1) the trial court improperly denied his motion to suppress; (2) the trial court failed to approve the verdicts as thirteenth juror; (3) the evidence was insufficient to support his assault convictions; and (4) the trial court erred in sentencing him to fifteen years in confinement consecutive to other outstanding sentences.

### A. Motion to Suppress

Appellant argues that the trial court erred by denying his motion to suppress. In his motion, appellant asserted that Deputy Gibbons lacked "a reasonable articulable suspicion" for initiating a traffic stop of co-defendant Carter's vehicle and that he lacked jurisdiction to initiate an out-of-county traffic stop.

In reviewing the trial court's decision on a motion to suppress, we review the trial court's legal conclusions de novo. *State v. Northern*, 262 S.W.3d 741, 747 (Tenn. 2008).

In doing so, we give deference to the trial judge's findings of fact unless the evidence preponderates otherwise. *Id.*; *see State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "'[C]redibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact.'" *Northern*, 262 S.W.3d at 747-48 (quoting *Odom*, 928 S.W.2d at 23). In reviewing the findings of fact, evidence presented at trial may "'be considered by an appellate court in deciding the propriety of the trial court's ruling on the motion to suppress.'" *State v. Garcia*, 123 S.W.3d 335, 343 (Tenn. 2003) (quoting *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001)). The prevailing party on the motion to suppress is afforded the "'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *Northern*, 262 S.W.3d at 748 (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)); *see State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000); *Odom*, 928 S.W.2d at 23.

### 1. Validity of Stop

A stop of a vehicle constitutes a seizure, entitling a vehicle's occupants to the full protections of the United States and Tennessee Constitutions. *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *State v. Brotherton*, 323 S.W.3d 866, 870 (Tenn. 2010); *State v. Pulley*, 863 S.W.2d 29, 30 (Tenn. 1993). A stop of a vehicle subjects the passengers, as well as the driver, to a seizure. *State v. Tyrone Ralph Wright*, No. M2010-02096-CCA-R3-CD, 2012 WL 601332, at *9 (Tenn. Crim. App. Feb. 23, 2012) (citing *Brendlin v. California*, 551 U.S. 249 (2007)). Accordingly, law enforcement must act reasonably when initiating such a stop. *Whren*, 517 U.S. at 809-10. In other words, authorities must have at least "an 'articulable and reasonable suspicion' to believe that a . . . violation has occurred when they initiate a traffic stop." *Brotherton*, 323 S.W.3d at 870 (quoting *Whren*, 517 U.S. at 810). "Reasonable suspicion exists when 'specific and articulable facts . . . taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). "An investigatory traffic stop under *Terry* 'is a far more minimal intrusion [than an arrest pursuant to probable cause], simply allowing the officer to briefly investigate further. If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way.'" *Id.* (quoting *Illinois v. Wardlow*, 528 U.S. 119, 126 (2000)).

Our supreme court has explained that reasonable suspicion is "a particularized and objective basis for suspecting the subject of a stop of criminal activity." *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). More specifically,

> [w]hen an officer has reasonable suspicion, supported by specific and articulable facts, to believe that a criminal offense has been or is about to be

committed, a brief investigatory detention is permitted. Reasonable suspicion must be supported by more than the officer's inchoate and unparticularized suspicion or 'hunch[ ]'; however, reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause . . . [and] can arise from information that is less reliable than that required to show probable cause.

Trial courts must examine the totality of the circumstances when evaluating whether an officer has established the requisite level of suspicion to justify a [brief investigatory] stop. These circumstances include an officer's observations, information from other law enforcement personnel or agencies, information from citizens, known patterns of criminal offenders, or deductions based upon experience. When evaluating the reasonableness of the police officer's suspicion, the nature of the crime suspected may be a factor.

*State v. Moats*, 403 S.W.3d 170, 178 (Tenn. 2013) (citations and internal quotation marks omitted).

Following the hearing on the motion to suppress, the trial court ruled that Deputy Gibbons was a credible witness and that he had reasonable suspicion to initiate the traffic stop. The court summarized that Deputy Gibbons was patrolling near the county line and received a BOLO about the fires and the small black car that had been seen earlier moving slowly. He then saw larger fires on the right side of the road, becoming smaller as he continued, "which would lead one to believe that [he] might be on the right trail here." Deputy Gibbons confirmed with the delivery man that the suspect vehicle was ahead of him and continued into White County to further investigate. Deputy Gibbons observed the vehicle about a mile into White County, traveling the same direction as the fires at the speed of around five miles per hour. Based on the totality of the circumstances, the trial court held that Deputy Gibbons had reasonable suspicion to stop the vehicle.

Because the evidence does not preponderate otherwise, we give deference to the trial court's findings of fact. The court also made credibility determinations that we will not disturb. We agree with the trial court that the totality of the circumstances established reasonable suspicion for officers to stop the car driven by co-defendant Carter. The trial court did not err in denying appellant's motion to suppress.

2. Jurisdiction

A proper analysis of this issue involves a two-fold inquiry: (1) was Putnam County Sheriff's Deputy Gibbons authorized to pursue appellant from Putnam County into White

County; and (2) was Deputy Gibbons authorized to arrest appellant in White County? We answer both questions in the affirmative.

Addressing the same issue, this court has held that when an officer is in pursuit of a vehicle within his jurisdiction, he is authorized to stop the vehicle after it crosses into another county. *State v. Gilbert*, 751 S.W.2d 454, 458 (Tenn. Crim. App. 1988) (citing *Francis v. State*, 498 S.W.2d 107, 114 (Tenn. Crim. App. 1973)). Once the officer stops the vehicle, he has every right to continue his investigation. *Id.* This case presents the same situation. Although he had not actually seen the vehicle while in Putnam County, Deputy Gibbons was aware that he was searching for a small black car occupied by two males and traveling at a very slow speed. Thus, he began his pursuit of co-defendant Carter's vehicle while within the jurisdiction of Putnam County. Upon information from a delivery man, he continued into White County in pursuit of the vehicle, which he learned was just ahead of him. Moreover, Deputy Gibbons observed that fires continued to be set along the route he was traveling; thus, he had an obligation to prevent further risk to lives or property. Deputy Gibbons was permitted to travel beyond the confines of the county line in pursuit of the vehicle and to continue his investigation therein.

However, once the vehicle was stopped and Deputy Gibbons continued his investigation, circumstances developed that culminated in the arrest of appellant. This arrest was made by Deputy Gibbons in White County. With regard to our second inquiry, this court has concluded that when a police officer effectuates an arrest of an alleged perpetrator outside of the jurisdiction of his law enforcement agency, he is legally authorized to do so if the arrest is one a private citizen would be authorized to make. *State v. John C. Kersey*, No. M2005-01653-CCA-R3-CD, 2006 WL 1896347, at *3 (Tenn. Crim. App. July 7, 2003) (citations omitted). Tennessee Code Annotated section 40-7-109(a) permits a private person to arrest another under the following circumstances:

(1)    For a public offense committed in the arresting person's presence;

(2)    When the person arrested has committed a felony, although not in the arresting person's presence; or

(3)    When a felony has been committed, and the arresting person has reasonable cause to believe that the person arrested committed the felony.

As this applies to the instant case, Deputy Gibbons retained his status as a police officer when he entered White County but was only authorized to effectuate arrests outside his

-12-

jurisdiction as a private citizen. After the vehicle was legally stopped, Deputy Gibbons had the authority to arrest appellant pursuant to the above conditions only.

We conclude that two exceptions existed that permitted Deputy Gibbons to arrest appellant. First, Deputy Gibbons had probable cause to believe that appellant had committed several arsons, which are felony offenses. In connection with the outbreak of fires, Deputy Gibbons was alerted to be on the lookout for a small black car occupied by two males that was traveling very slowly. As he drove, he observed a line of fires on the side of the road, progressively becoming smaller as though newly set. Believing he was on the correct path, he spoke with a delivery man, who confirmed that a vehicle matching that described in the BOLO was just ahead of the officer. Deputy Gibbons then continued and observed a vehicle that matched the description. He had reasonable cause to believe that the occupants of the vehicle had been involved in setting the felonious fires. Moreover, appellant committed the crime of aggravated assault in Deputy Gibbons' presence, authorizing him to arrest appellant in White County.

We further note:

> An illegal stop, arrest or seizure does not justify the total exclusion of whatever takes place after the illegal stop, seizure, or arrest. This conclusion is especially true when applied to crimes committed subsequent to the illegal stop, seizure, or arrest. Such evidence is not obtained as a direct result of exploitation of a constitutionally infirm stop, arrest, or seizure. For instance, if an officer makes an illegal stop of a motor vehicle, and the driver of that vehicle subsequently gets out of his or her car and assaults the officer, prosecution for the assault, and any evidence seized as a result of an arrest for the assault, should not be suppressible even though there was an illegal stop of a vehicle.

*State v. Robert Lee Mallard*, No. M2000-00351-CCA-R3-CD, 2001 WL 178461, at *4 (Tenn. Crim, App. Feb. 23, 2001). Therefore, even if there was a "constitutionally infirm seizure" of appellant, when appellant wielded a knife and threatened the deputies with it, they had probable cause to arrest him for aggravated assault. *Id.* Appellant is not entitled to relief on this claim of error.

## B. Thirteenth Juror

Appellant argues that the original trial judge failed to explicitly approve the jury's verdicts as required by the Tennessee Rules of Criminal Procedure and that the successor judge could not have properly done so.

"Rule 33[(d)] imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case, and . . . approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995) (citing *Messer v. State*, 385 S.W.2d 98, 101 (Tenn. 1964); *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993)); *see* Tenn. R. Crim. P. 33(d). Just as at common law, Rule 33(d) does not require the trial court to recite talismanic language when approving a jury's verdict. *Id.* Rather, an appellate court may presume that the trial judge has served as the thirteenth juror and approved the jury's verdict when the trial judge overrules a motion for new trial. *Id.*

In this case, after reciting the jury's verdict, the original trial court stated, "[T]he court agrees and adopts the verdict in this case . . . ." We conclude that said language is sufficient to meet the requirements of Tennessee Rule of Criminal Procedure 33(d). *See State v. Joel E. Blanton*, M2007-01384-CCA-R3-CD, 2009 WL 537558, at *9 (Tenn. Crim. App., Mar. 4, 2009); *cf. State v. Biggs*, 218 S.W.3d 643, 654 (Tenn. Crim. App. 2006) (holding that a trial judge's statement of approval "based on the jury's verdict" was insufficient to fulfill its obligation as the thirteenth juror). Appellant is not entitled to relief.

## C. Sufficiency of the Evidence

Appellant claims that the evidence underlying his convictions for aggravated assault and assault was insufficient to sustain his convictions. He specifically contends that had the officers reasonably feared imminent bodily injury, they would have retreated from the confrontation rather than moving closer to appellant.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn.

2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

As indicted in this case, one commits the offense of assault who "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." Tenn. Code Ann. § 39-13-101(a)(2). The assault becomes "aggravated" by use or display of a deadly weapon. *Id.* § 39-13-102 (a)(1)(A)(iii). Although appellant was indicted for aggravated assault of both officers, the jury found him guilty of aggravated assault of Deputy Harris and guilty of simple assault of Deputy Gibbons. The same evidence was relied upon by the State for both counts of the indictment.

The evidence established that appellant displayed a knife, which is a deadly weapon. He wielded it in the direction of law enforcement officers. They each testified to their fear and stated that they were in the "reactionary gap" in which appellant could have stabbed them before they could defend themselves. Deputy Harris was closer in proximity to appellant than was Deputy Gibbons. The reasonableness of the deputies' fear in light of their failure to retreat was a question of fact for the jury, which we will not revisit. The trial court approved this verdict, and appellant is not entitled to relief on this claim.

### D. Sentencing

Appellant claims that the trial court erred in sentencing him as a persistent offender to fifteen years in confinement to be served consecutively to other outstanding sentences because the trial court failed to place on the record the reasons for its decision. Our review of the record indicates that the trial judge who heard the case also conducted a sentencing hearing. The trial judge made no oral findings and indicated that she would issue a sentencing order. However, that was never done. A subsequent trial judge entered the

judgments without entering a sentencing order. Therefore, neither oral nor written findings setting forth the reasons for appellant's sentences are available.

At the original sentencing hearing, appellant contested his offender status. The trial court took the matter under advisement. In this unique procedural posture, the original trial court received all of the testimony, and it is unclear from the record what information the successor judge utilized in ordering consecutive sentencing and setting the offender status as persistent. Because the trial court failed to set forth any reasons for its sentencing decision, we must reverse appellant's sentences and remand for a new sentencing hearing. *See State v. Bise*, 380 S.W.3d 682, 705 n.41 (Tenn. 2012).

## CONCLUSION

Based on the record as a whole, the briefs of the parties, and the applicable legal authorities, we affirm appellant's convictions. However, we reverse his sentences and remand for proceedings consistent with this opinion.

_____
ROGER A. PAGE, JUDGE